**DISCOVERY NETWORK, INC. and Harmon Publishing Co., Plaintiffs–Appellees,**

v.

**CITY OF CINCINNATI, Defendant– Appellant.**

No. 90–3817.

United States Court of Appeals, Sixth Circuit.

Argued April 30, 1991.

Decided Oct. 11, 1991.

Marc D. Mezibov (briefed), Martha K. Landesberg (argued), Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, Ohio, for plaintiffs-appellees.

Richard H. Castellini, City Solicitor's Office for the City of Cincinnati, Mark S. Yurick (argued and briefed), Office of the City Sol., Cincinnati, Ohio, for defendant-appellant.

Before KRUPANSKY and BOGGS, Circuit Judges, and DUGGAN, District Judge.*

BOGGS, Circuit Judge.

■ The case involves the constitutionality of Cincinnati's ordinance prohibiting the distribution of commercial handbills on public property. This ordinance effectively grants distributors of "newspapers," such as the *Cincinnati Post*, *USA Today*, and the *Wall Street Journal*, access to the public sidewalks through newsracks, while denying that same access to distributors of "commercial handbills." The district court rendered a judgment preventing enforcement of this ordinance because it violates the first amendment. The city appealed, arguing that the ordinance was constitutionally permissible as a regulation of "commercial speech" because of the "lesser protection" such speech is afforded under the first amendment. Because we believe that "commercial speech" only receives lesser first amendment protection when the governmental interest asserted is either related to regulating the commerce the "commercial speech" is promoting, or related to any distinctive effects such commercial activity would produce, and neither governmental interest is asserted here, we affirm the district court.

I

Plaintiffs are publishers of publications distributed throughout the Cincinnati metropolitan area. Discovery Network pub-

---

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

lishes a magazine that advertises learning programs, recreational opportunities, and social events for adults. Harmon Publishing publishes and distributes *Home Magazine,* which lists houses and other residential real estate for sale or rent. Both plaintiffs use newspaper dispensing devices ("newsracks") placed on public right-of-ways to distribute their publications.

Both plaintiffs had been given permission by the city to place newsracks along public right-of-ways to distribute their publications according to Amended Regulation 38.[1] Their status changed, however, in February 1990 when the City Council passed a motion requiring the Department of Public Works to enforce the existing ordinance prohibiting the distribution of "commercial handbills" on public property. *Cincinnati Municipal Code* § 714–23.[2] Plaintiffs brought suit under 42 U.S.C. § 1983, requesting declaratory and injunctive relief. This case ultimately came before the district court for an evidentiary hearing on two issues: whether the regulation violated plaintiffs' first amendment rights, and whether the city's mechanism for appealing the administrative decision to enforce the ordinance violated plaintiffs' right to due process.

The court held that hearing on July 9, 1990. In that hearing, the city contended that the newsracks pose aesthetic and safety problems for the city. The aesthetic problems arise because of the non-uniform design and color schemes of the different types of newsracks. The safety problems arise because the racks are placed near busy streets, especially near crosswalks and bus stops. They are also attached by chains to city fixtures, such as lightpoles, causing the fixtures to rust. However, there are currently no city regulations establishing any safety or aesthetic standards for newsracks.

Neither the City Architect nor the City Engineer could distinguish the commercial from the non-commercial newsracks. In fact, the Architect testified that the city's aesthetic concerns would be alleviated by an ordinance regulating the color and size of all newsracks. Both witnesses seemed primarily concerned about the potential proliferation of the total number of newsracks as a result of newsracks distributing commercial speech. The Engineer testified that the only areas in which commercial newsracks differed from non-commercial newsracks was in the potential for proliferation, and in the enhanced first amendment protection accorded to devices dispensing non-commercial publications. He believed such proliferation was likely because he had received four requests for permits from commercial publishers for newsrack permits in the prior two years,

---

1. The Amended Regulation reads in pertinent part as follows:

> 1. All devices located within the public right-of-way for the purpose of dispensing newspapers must be shown on a site plan of the immediate vicinity of the device.... The site plan and request to place newspaper vending device [sic] in public right-of-way [sic] must be presented to and approved by the City Manager or his designee prior to the placement of the device....
> 3. Placement of the newspaper dispensing device must be such that it is not accessible from that part of the right-of-way normally reserved for vehicular traffic and does not obstruct normal pedestrian traffic, interfere with handicap access, create driver sight distance problems or otherwise create a public nuisance nor shall the method of attachment allow the device to be moved after placement to create these problems....
> 6. The owner/operator of newspaper dispensing devices within the public right-of-way

must register a responsible contact person ... with the City Manager.... This contact person shall be able to respond in a reasonable time to problems relative to the enforcement of these rules and regulations.

2. A "commercial handbill" is defined as:

> any printed or written matter, any sample or device, dodger, circular, leaflet, pamphlet, paper, booklet or otherwise reproduced original or copies of any matter of literature:
> (a) which advertises for sale any merchandise, product, commodity or thing; or
> (b) which directs attention to any business or mercantile or commercial establishment, or other activity, for the purpose of either directly or indirectly promoting the interest thereof by sales; or
> (c) which directs attention to or advertises any meeting, theatrical performance, exhibition or event of any kind for which an admission fee is charged for the purpose of private gain or profit.

the first such requests he had ever received.[3] The Architect's testimony followed the Engineer's, as he believed that permitting plaintiffs' newsracks to remain would send a signal to other commercial publishers that newsracks were a permissible way to distribute the publications, thereby increasing the number of racks.

The court ruled in favor of the city on the due process claim, but in favor of the plaintiffs on the first amendment claim. The court reached many conclusions of law: that the publications were commercial speech within the meaning of the first amendment because they proposed commercial transactions in the form of advertisements;[4] that commercial speech was entitled to first amendment protection where, as here, the activities promoted were lawful and the speech itself not inherently misleading; and that the ordinance would be measured against the four-part test announced by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). That test provides that a government regulation will be upheld if it (1) regulates commercial speech; (2) promotes a substantial governmental interest; (3) directly advances that interest; and, (4) is not more extensive in its regulation of speech than is necessary to serve that interest. *Id.*

The court focused its analysis on the last part of that test. The court applied the Supreme Court's interpretation of the fourth part of the *Central Hudson* test in *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The *Fox* Court stated that a regulation is not more extensive than necessary when it is a reasonable fit between the ends directly advanced by the statute and the means chosen as embodied in the regulation. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034. The Court held that the government has the burden of proving the reasonableness of that fit. *Id.*

The district court's analysis led it to conclude that the city's ordinance did not constitute a reasonable fit between its asserted ends and the means chosen. The court held that a complete ban on newsracks distributing commercial speech violated the *Fox* test. Only 62 of the between 1,500 and 2,000 newsracks present on the city's streets belonged to the plaintiffs. Based on the city's concession that newsracks dispensing "non-commercial" papers caused the same problems as those distributing commercial papers, the court held that the

---

*Cincinnati Municipal Code* § 701-1-C.

3. This argument rests on the assumption that there is an infinite number of commercial publishers who might seek permits, but only a finite number of non-commercial publishers. In light of the growing nationalization of newspapers in this country, that assumption is somewhat tenuous at best. The city provided no direct evidence regarding the increase in the number of non-commercial publishers dispensing their wares through newsracks. However, the Architect testified that "it was not very long ago that the *Cincinnati Post* and the *Cincinnati Enquirer* were the only ones with dispensing devices on the City streets." We take judicial notice of the fact that *USA Today*, the *New York Times*, the *Wall Street Journal*, and the *Business Courier* all have dispensing devices on the corner across from the Federal Courthouse.

4. In this case, plaintiffs do not question the contours of the delineation between "commercial" and "non-commercial" speech. We will thus adopt and adhere to that terminology, although we find it somewhat anomalous to de-

nominate as "non-commercial" institutions such as the *New York Times* and Gannett (publisher of the *Cincinnati Post*), each of which has assets and revenues in the billions of dollars, and profits in the many millions of dollars.

Obviously, a quite significant part of the space in "newspapers" is devoted to purely commercial activities, while publications such as plaintiffs' may (and certainly could easily) contain some editorial material, such as comments or articles on education or real estate matters. The first amendment by its terms does not make this distinction; it protects "speech." An analogous practice, deciding on content-based grounds which beliefs merit classification as "religion" protected by the establishment and free exercise clauses of the first amendment, has been severely limited by courts to avoid impermissible government interference into protected activity. *See United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). *See also* G. Stone, L. Seidman, C. Sunstein, and M. Tushnet, *Constitutional Law* 1369-73 (1986).

regulation was an excessive means to accomplish the stated ends.

Cincinnati timely appealed the court's determination.[5]

## II

### A

Both parties agree on the legal contours within which this case must be decided. Both parties agree that this case requires the application of the four-part *Central Hudson* test, and the interpretation given by the Supreme Court to the fourth part of that test in *Fox*. Both parties agree that this ordinance satisfies the first two parts of the test: in this case it regulates purely commercial speech,[6] and Cincinnati's interests in street safety and city aesthetics are substantial. As it is clear that the ordinance directly advances the purposes asserted, we have only one issue before us: Does Cincinnati's ordinance banning the distribution of commercial handbills along city streets and sidewalks prescribe a "reasonable fit" between the ends asserted and the means chosen to advance them? We hold that it does not.

### B

In establishing the "reasonable fit" requirement, the Court in *Fox* attempted to draw a middle ground between greater and lesser review of a regulation of commercial speech. The Court expressly rejected imposing either a "least restrictive means" or a "rational basis" standard of review on regulations of commercial speech. *Fox*, 492 U.S. at 479–81, 109 S.Ct. at 3034–35. The Court rejected the least restrictive means approach as inconsistent with its prior commercial speech jurisprudence, and rejected the rational basis approach because "[t]here it suffices if the law could be thought to further a legitimate governmental goal, without reference to whether

it does so at inordinate cost." *Fox*, 492 U.S. at 480, 109 S.Ct. at 3035. The Court described its "reasonable fit" approach as one "that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served'.... Here we require the government goal to be substantial, and the cost to be carefully calculated." *Id.* We presume that the cost referred to by the *Fox* Court is that which would accrue because of the burden placed on the commercial speech, and that the *Fox* test requires that such costs must be outweighed by the benefits of the asserted regulation. We can only make that calculation if we know what value the Court has placed on commercial speech, and it is to that consideration that we now turn.

### C

Commercial speech has unquestionably been protected by the first amendment since the Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), held that the Court's prior offhand statement in *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), that "purely commercial advertising" was not protected did not establish an exception to first amendment protection. The Court recognized in *Virginia Citizens* that commercial speech, though it may not touch upon the highest topics of human existence (indeed, much protected speech does not), is important to the public welfare. The Court noted in *Virginia Citizens* that speech uttered solely for economic motives has high value to those who listen to it. "As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Virginia Citizens*, 425 U.S. at 763, 96 S.Ct. at 1826. In recognizing the

---

**5.** The plaintiffs have not cross-appealed from the court's judgment for the city on the due process claim.

**6.** However, it should be noted that the ordinance can also be applied to "newspapers." All newspapers advertise products for sale, or direct

attention to business establishments for the purpose of directly or indirectly promoting the sales thereof (restaurant or theater reviews), or direct attention to events of any kind for which an admission fee is charged for the purpose of private profit (Reds or Bengals games).

importance of commercial speech to private economic activity, the Court was once again affirming that the "right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge" is "essential to the orderly pursuit of happiness by free men." *Board of Regents of State College v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)). The Court recognized that having made this decision, one with which we have no quarrel, commercial advertising is essential because it conveys information that permits each person to decide which trades and economic decisions are best for that person. *See Virginia Citizens,* 425 U.S. at 764, 96 S.Ct. at 1827. "Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal." *Id.* at 765, 96 S.Ct. at 1827. As such, commercial speech also has a high value to the society as well.

The Court did not mean to free commercial speech from all regulation and create some sort of an advertiser's paradise. The Court noted that time, place, and manner restrictions could be applied to commercial speech, provided that such restrictions are content-neutral. *Virginia Citizens,* 425 U.S. at 771, 96 S.Ct. at 1830. False and misleading speech could also be regulated or banned, *id.,* including types of commercial speech that may merely be likely to deceive the public. Also, speech proposing illegal commercial transactions may be banned. *Id.* at 772, 96 S.Ct. at 1831. As at least the prior regulation of speech considered potentially false or misleading would be impermissible if applied to political speech, the Court's decision effectively left commercial speech with lesser protection than that afforded to other types of speech. The Court has continued to adhere to these principles in its subsequent commercial speech jurisprudence. *See Central Hudson,* 447 U.S. at 563–64, 100 S.Ct. at 2350.

■ This "lesser protection" afforded commercial speech is crucial to Cincinnati's argument on appeal. Cincinnati argues that placing the entire burden of achieving its goal of safer streets and a more harmonious landscape on commercial speech is justified by this lesser protection. The city correctly notes that many courts have held that a city cannot ban newsracks containing traditional newspapers that comment on current affairs, thereby precluding it from alleviating its problem by completely banning newsracks from the city.[7] It asks us to hold that, in light of that restriction, its policy of banning only newsracks distributing commercial speech is a cost-effective way of alleviating its problem, and therefore meets the *Fox* test.[8]

■ The fact that commercial speech is owed less protection than is political speech does not lead to Cincinnati's conclusion that commercial speech has a low value in first amendment jurisprudence. "While [the plaintiff's] speech is primarily commercial in nature, and thereby not subject to all of the traditionally stringent protections of the first amendment, it is nevertheless entitled to substantial protections." *American Motors Sales Corporation v. Runke,* 708 F.2d 202, 208 (6th Cir.1983). Our examination of that jurisprudence shows us that

---

**7.** *See Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1196–97 (11th Cir.1991), and cases cited therein.

**8.** Cincinnati also argues that we should defer to the city's decision so long as it is reasonable. It draws this conclusion from two sentences in *Fox* that "we have been loath to second-guess the Government's judgment," *Fox,* 492 U.S. at 478, 109 S.Ct. at 3034, and that "[w]ithin those bounds [the reasonable fit test] we leave it to the governmental decisionmakers to judge what manner of regulation may best be employed." *Fox,* 492 U.S. at 480, 109 S.Ct. at 3035. We do not believe that these statements command us to give the city the benefit of the doubt in close cases, as Cincinnati would have it. Rather, they are meant to distinguish the Court's test in *Fox* from the least restrictive means test urged on the Court by the defendant. A least restrictive means test can be satisfied by only one method of regulation, while the *Fox* test can be satisfied by many different methods. If the Court's words mean what Cincinnati argues they do, then the *Fox* Court's subsequent rejection of the fourteenth amendment rational basis test would be a glaring inconsistency.

the lesser value placed on commercial speech only justifies regulations dealing with the content of the speech itself, or with distinctive effects that the content of the speech will produce. In every commercial speech case but one,[9] a regulation upheld as constitutional by the Court fell into one of two groups. In the first, the regulation sought to ban speech believed to be inherently false or misleading.[10] In the second group, the regulation sought to alleviate distinctive adverse effects allegedly caused by and directly flowing from the type of commercial speech regulated.[11] It is clear that Cincinnati's ordinance does not attempt to regulate plaintiffs' speech be-

---

**9.** That one case is *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). In *Metromedia,* the Court overturned an ordinance that banned outdoor, off-site advertising displays as an attempt to increase traffic safety and enhance appearance. These interests are very similar to those advanced by Cincinnati in defense of its ordinance. The ordinance at issue in *Metromedia* is also the only regulation of commercial speech that has yet come before the Court where a government attempted to do what Cincinnati is trying so here, regulate a *manner* of conveying commercial speech in order to combat perceived evils wholly unrelated to the commercial content of that speech. Thus, if the majority of the Court had upheld San Diego's statute as a permissible regulation of commercial speech, we would be compelled to reverse the district court. However, only a plurality of the Court found that the San Diego ordinance constitutionally regulated commercial speech. The concurrence specifically—and vehemently—disagreed with that conclusion. *See Metromedia,* 453 U.S. at 536, 101 S.Ct. at 2907 (Brennan, J., concurring). The Court's judgment rested on the ground that San Diego's ordinance was an impermissible content-based restriction on noncommercial speech because it only permitted on-site signs with certain types of speech. *Metromedia,* 453 U.S. at 521, 101 S.Ct. at 2899. As the Court has stated that "when no single rationale commands a majority, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgmen[t] on the narrowest ground,'" *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 764 n. 9, 108 S.Ct. 2138, 2148 n. 9, 100 L.Ed.2d 771 (quoting *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)), we do not view the plurality dicta in *Metromedia* as controlling the outcome of this case.

**10.** *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (regulation banning the use of illustrations in lawyer advertising and banning statements in such advertisements offering legal advice and information as misleading unconstitutional; regulation requiring disclosure that legal "fees" and "costs" are distinct financial obligations in retaining a lawyer to avoid misleading public constitutional); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (statute prohibiting the advertisement of optometry practices through trade names as misleading constitutional). The Court also ruled many regulations to be unconstitutional in this group. *See Peel v. Attorney Registration and Disciplinary Comm'n of Ill.,* — U.S. —, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990) (regulation banning lawyer advertisement of certification by the National Board of Trial Advocacy as misleading unconstitutional); *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (regulations limiting the precise names of practice areas lawyers can use in ads and identifying the jurisdictions lawyer is licensed in as misleading unconstitutional); *Bates v. State Bar of Ariz.,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (regulation banning lawyer advertisement of prices for routine legal services as misleading unconstitutional).

**11.** *See Posadas De Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (statute banning advertising of casino gambling directed to Puerto Rico residents to prevent bad effects on morals of residents constitutional); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (regulation banning in-person solicitation of accident victims for legal business because victims may be coerced into hiring lawyer constitutional); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (regulation setting different zoning regulations for pornographic theatres or bookstores to prevent neighborhood deterioration and crime increases constitutional). The Court has also declared many regulations to be unconstitutional that fall into this category. *See Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) (regulation banning solicitation for legal business mailed on a personalized or targeted basis to prevent potential clients from feeling undue duress to hire the attorney unconstitutional); *Bolger, et al. v. Youngs Drug Product Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (statute banning unsolicited mailings advertising contraceptives to aid parental authority over teaching their children about birth control unconstitutional); *Central Hudson* (statute preventing promotional advertisement by electric utility to conserve energy unconstitutional); *Bates v. State Bar of Ariz.,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (regulation banning advertisement of prices for routine legal services because of concern that legal pro-

cause it is false or misleading. Therefore, plaintiffs' speech receives lesser first amendment protection only if Cincinnati's reason for regulating it falls into the second group of cases. We can best demonstrate what sort of rationale for regulation is included in the second group by listing a few examples.

In each case where the Court *upheld* a regulation on commercial speech that attempted to burden that speech because of perceived adverse effects on the community, those effects flowed naturally from personal actions fostered by the commercial content of the speech itself. In *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), Detroit passed a zoning ordinance requiring sexual entertainment establishments to be at least 1000 feet apart from one another. The city believed that permitting such establishments to be closer would foster crime, prostitution, and neighborhood decay. However, the adverse effects of increased crime, prostitution, and neighborhood decay would allegedly occur because of the sort of person attracted to the location of these businesses. Also, in *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), the Commonwealth banned advertising of casino gambling that was directed at or detectable by Puerto Rican citizens. The reason given was that fostering gambling among Puerto Ricans would disrupt moral and cultural patterns, increase crime and prostitution, and foster organized crime and corruption. These problems, however, would all arise because Puerto Ricans would be more likely to frequent casinos and gamble if they were exposed to casino advertising. In each case, the adverse effect would occur as a direct result of persons acting upon the commercial *content* (availability of sexual entertainment, availability of casino gambling) of the speech regulated.

■ These observations destroy Cincinnati's argument in favor of its ordinance.

The defense of that ordinance rests solely on the low value allegedly accorded to commercial speech in general. However, we observe that the Court actually accords a high value to commercial speech except in the two specific circumstances outlined above. Neither of them are present here. Cincinnati is not regulating the content of plaintiffs' publications. Neither is Cincinnati attempting to alleviate a harm caused by the content of the publications. Cincinnati is attempting to place a burden on a particular type of speech because of harms caused by the *manner* of delivering that speech. "We review with special care regulations that entirely suppress commercial speech in order to pursue a non-speech related policy." *Central Hudson*, 447 U.S. at 566 n. 9, 100 S.Ct. at 2351 n. 9. Cincinnati's non-speech related policy does not survive that special review.

If commercial speech has a high value in the *Fox* calculus absent the two specific circumstances, then Cincinnati's ordinance cannot be a "reasonable fit." Plaintiffs will bear a very heavy burden by being completely deprived of access to the city streets. Discovery currently distributes 33% of its magazines through newsracks banned by the ordinance; Harmon, 15%. The benefit gained by the city, on the other hand, is miniscule. Plaintiffs own only 62 of the between 1,500 and 2,000 newsracks currently on city streets. As commercial speech has public and private benefits apart from the burdens directly placed on Discovery Network and Harmon, the burden placed on it by Cincinnati's ordinance cannot be justified by the paltry gains in safety and beauty achieved by the ordinance. While Cincinnati argues that this is the best option open to it in light of the protection afforded to newsracks dispensing traditional newspapers, "the First Amendment does not permit a ban on certain speech merely because it is more efficient" than other alternatives. *Shapero*, 486 U.S. at 473, 108 S.Ct. at 1921.

---

fessionalism will decline unconstitutional); *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (regulation banning placement of "for sale" signs in the front lawns of houses in order to prevent the town from losing its integrated racial status unconstitutional); *Virginia Citizens* (statute banning price advertising by pharmacists because of concern that pharmacists' professionalism would decline unconstitutional).

In contrast to Cincinnati's fears, it has many options open to it to control the perceived ill effects of newsracks apart from banning those dispensing commercial speech. To the extent that the use of chains to fasten the newsracks is unsafe, a regulation requiring that all newsracks be bolted to the sidewalk would solve the problem. To the extent that aesthetics are a concern, a regulation establishing color and design limitations upon all newsracks would fit the bill. In fact, counsel for Cincinnati admitted at oral argument that it is currently working on an ordinance of this sort with representatives of traditional newspapers. To the extent that the number of newsracks is disturbing, the city can establish a maximum number of newsracks permitted on city sidewalks, and distribute them either through first-come, first-serve permit rationing or by selling permits to the highest bidder. We are confident that many more options exist for the city, so long as they do not treat newsracks differently according to the content of the publications inside.

### III

■ We also write briefly to explain why Cincinnati's ordinance does not pass constitutional muster on other grounds. The ordinance treats newsracks differently on the basis of the commercial content of the publications distributed. Cincinnati's ordinance, therefore, cannot qualify as a constitutional time, place, and manner restriction because it is not content-neutral. *See Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Rzadkoollowski v. Village of Lake Orion*, 845 F.2d 653 (6th Cir.1988); *Wheeler v. Commissioner of Highways, Commonwealth of Kentucky*, 822 F.2d 586, 590 (6th Cir.1987) ("the Billboard Act and regulations apply evenhandedly to commercial and non-commercial speech; they discriminate against no view or subject matter"). A content-neutral speech regulation is one *"justified* without reference to the content of the regulated speech," *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986). Cincinnati's argument on appeal, in contrast, relies on the lesser protection allegedly accorded to commercial speech.[12]

■ Cincinnati could argue that its ordinance is content-neutral because it was not "adopted ... because of disagreement with the message [the regulated speech] conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). Cincinnati could argue that its enforcement of the ordinance is directed solely at the aesthetic and safety problems caused by newsracks, and therefore is not a content-based decision. However, we cannot accept that argument for two reasons. First, Cincinnati's position is based on the argument that it can treat newsracks distributing commercial speech differently than those distributing commentary on public affairs. Given the wide

---

**12.** Nor does Cincinnati's ordinance qualify as content-neutral under the "secondary effects" doctrine promulgated by the Court in *Playtime Theatres.* There, the city enacted a zoning ordinance keeping sexual entertainment movie theaters 1,000 feet apart from a residential zone, church, or park, and one mile from any school. The Court in *Playtime Theatres* stated that the ordinance was content-neutral, and therefore reviewable under the time, place, and manner regulation standard, because the primary concern of the city in enacting the ordinance was to control the secondary effects caused by the theaters. *Playtime Theatres,* 475 U.S. at 48, 106 S.Ct. at 929. While Cincinnati is attempting to control effects on the city's landscape and fixtures, these effects are neither secondary nor caused by the speech being regulated. In *Playtime Theatres,* the effects—increased crime and decreased neighborhood quality, among oth-

ers—were secondary to the primary effect of the theaters; the dissemination of sexually explicit entertainment. Here, the very existence of different types of newsracks causes aesthetic problems for the city. Additionally, in *Playtime Theatres,* the effects were caused by the nature of the speech disseminated in the theaters. Here, the effects newsracks may have on the city's aesthetic and safety interests are the same for all newsracks, whether the publications inside are commercial or non-commercial speech.

Had Cincinnati produced evidence that the types of newsracks distributing commercial speech caused effects distinct from newsracks distributing newspapers, such as the clogging of downtown streets caused by auto buffs crowding around to obtain the latest issue of *Auto World,* the ordinance may have been constitutional under the secondary effects doctrine. This, however, is not the case.

range of options open to the city to control the perceived ill effects of newsracks without completely banning those distributing commercial speech, we find it hard to believe that the city does not in fact favor the distribution of newspapers such as the *Cincinnati Post* and the *Cincinnati Enquirer* on its street corners over that of *Home Magazine.* The failure of the city to even include representatives of plaintiffs—and other publishers of commercial publications—in its ongoing discussions with newspaper representatives regarding aesthetic and safety regulations governing newsrack appearance and fastening provides further proof of an unadmitted bias against commercial speech.[13] Second, Cincinnati's hypothetical argument only addresses the enforcement of the ordinance. The ordinance itself was on the books long before this problem supposedly arose. There is no argument advanced that the ordinance's ban on distribution of commercial handbills, by any method, not merely by newsracks, was not directed against commercial speech based on its content.[14]

Nor can the ordinance pass muster as a valid content-based restriction. "Content based restrictions 'will be upheld only if narrowly drawn to accomplish a compelling governmental interest.'" *Barnes v. Glen Theatre, Inc.,* —— U.S. ——, 111 S.Ct. 2456, 2474, 115 L.Ed.2d 504 (White, J., dissenting) (quoting *Sable Communications of Cal., Inc. v. Federal Communications Comm'n,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989)). This standard has been interpreted to require a government to choose the least restrictive means to further the governmental interest. *Sable Communications,* 492 U.S. at 126, 109 S.Ct. at 2829. The ordinance is clearly not the least restrictive means, as it places a substantially greater burden on commercial speech than is necessary to alleviate the city's aesthetic and safety concerns.

IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**13.** The Architect's testimony is illuminating on this point.

> Q: Does the City have means to deal with the proliferation of non commercial publishers who are seeking City permits?
> A: The City is attempting to work cooperatively with the non commercial publishers to place the devices in an orderly manner and in some cases to agree to certain standard devices, particularly in the center business district.
> Q: Can't those very same regulations be applied to commercial publishers?
> A: They could if commercial publications were considered legal.

**14.** Cincinnati's ordinance would not pass muster even if it met the requirement that it be content-neutral. The second part of the time, place, and manner standard is that the regulation be "'narrowly tailored to serve a significant governmental interest.'" *Rock Against Racism,* 491 U.S. at 796, 109 S.Ct. at 27 (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984)). The ordinance is not narrowly tailored because there are many options available to the city that would address its aesthetic, safety, and proliferation concerns without placing the significant burden on commercial speech that the ordinance does. *See supra,* at p. 471. None of these options would be less effective in promoting the asserted interests than is the complete ban on distribution of commercial handbills. *See Rock Against Racism,* 491 U.S. at 799–800, 109 S.Ct. at 2757–59.