Kathryn **MOSER** and National Association of Telecomputer Operators, Plaintiffs,

v.

**FEDERAL COMMUNICATIONS COMMISSION**, a federal agency, and James H. Quello, in his capacity as interim Chairman of the Federal Communications Commission, Defendants.

Civ. No. 92–1408–RE.

United States District Court, D. Oregon.

May 21, 1993.

See also, 811 F.Supp. 541.

Charles F. Hinkle, Julianne Ross Davis, Stoel Rives Boley Jones & Grey, Portland, OR, for plaintiffs.

Jack C. Wong, U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty., Portland, OR, Stuart E. Schiffer, Acting Asst. Atty. Gen., Theodore C. Hirt, C. Gail Walker, U.S. Dept. of Justice, Civ. Div., Jane E. Mago, Asst. Gen. Counsel, James M. Carr, F.C.C., Washington, DC, for defendants.

REDDEN, Chief Judge:

In December 1992, this court granted plaintiffs' motion for a preliminary injunction enjoining defendants from enforcing 47 U.S.C. § 227(b)(1)(B), which prohibits using an artificial or prerecorded voice to deliver some commercial messages to residential telephone lines without the consent of the called party. During the ensuing months, both parties have moved for dispositive rulings and submitted supporting memoranda.

Oral argument was heard on 16 March 1993, and the parties have since filed supplemental briefing on two recent Supreme Court decisions relevant to the issues presented here. Final briefing was received from the parties on 12 May 1993. For the reasons that follow, plaintiffs' motion for summary judgment is granted.

## BACKGROUND

In 1991, Congress enacted the Telephone Consumer Protection Act ("TCPA"), which amended the Communications Act of 1934 by restricting telephone solicitation techniques. The amendment provides in part:

(b) RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT—

(1) PROHIBITIONS—

It shall be unlawful for any person within the United States—

\* \* \* \* \* \*

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the [Federal Communications] Commission under Paragraph (2)(B);

\* \* \* \* \* \*

(2) REGULATIONS; EXEMPTIONS AND OTHER PROVISIONS—

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent; and

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i) calls that are not made for a commercial purpose; and

(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

(I) will not adversely affect the privacy rights that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement.

47 U.S.C. § 227(b).

The Federal Communications Commission (FCC) promulgated regulations under the TCPA which were to have become effective 20 December 1992. This court issued a preliminary injunction because serious questions were raised regarding whether there was a reasonable fit between the TCPA and the desired objective of enhancing residential privacy.

That ruling was influenced substantially by *Discovery Network, Inc. v. Cincinnati*, 946 F.2d 464 (6th Cir.1991). The Sixth Circuit held that invocation of an ordinance resulting in a ban of commercial handbill distribution on public property placed a substantially greater burden on commercial speech than was necessary to alleviate aesthetic and safety concerns related to the proliferation of newsracks on city streets.

On 24 March 1993, the Supreme Court affirmed the Sixth Circuit's decision. *Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The Court concluded that the city failed to establish that a reasonable fit existed between the restrictions being placed upon commercial speech through the ban on commercial handbill newsracks, and the goals of safety and aesthetics the city sought to serve by invoking such a ban.

## ANALYSIS

The two conclusions drawn after the 17 December 1992 preliminary injunction hearing remain valid: the TCPA affects commercial speech and must therefore pass muster under the constitutional standards protecting commercial speech, and the government's interest in promoting residential privacy, which prompted the TCPA, is substantial.

### A. Jurisdiction

At the outset, this court must address the government's assertion that the exercise of jurisdiction must distinguish the TCPA as a statute from the FCC's related regulations. The government contends that the statute—on its face—bans *all* unsolicited, prerecorded calls not initiated for emergency purposes, regardless of the message's content. Congress authorized the FCC to implement the requirements of the statute, and allowed the FCC to establish exemptions to this ban, under 47 U.S.C. § 227(b)(2)(B). That section states that the FCC may exempt calls that are not made for a commercial purpose.

The circuit courts of appeals have exclusive jurisdiction to review FCC regulations. 28 U.S.C. § 2341; 47 U.S.C. § 402(a); *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984). Here, however, the statute itself establishes a distinction between commercial and noncommercial speech in the implementing instructions it provides to the FCC. The report submitted by the House Committee on Energy and Commerce, in which the Committee discussed its findings related to the proposed exclusion of calls from tax exempt organizations in an earlier version of the bill, states:

In crafting [the statute], the Committee was sensitive to restraints on its authority to regulate the speech of charitable and political organizations, speech which the Supreme Court has identified as "core" First Amendment Speech.... [T]he Committee found that solicitations by such organizations were less of a problem than commercial calls. It is on this basis that the Committee believes that the scope of the regulation is a workable "commercial

speech" distinction consistent with Supreme Court precedent.

H.Rep. No. 102–317, 102d Cong., 1st Sess., 17 (1991) (citations omitted) (referred hereinafter as "House Report"). This court has jurisdiction—and properly undertakes this examination—regarding the attempt by Congress to distinguish and permit restriction of commercial speech in passage of the TCPA.

### B. *Is the TCPA Content–Neutral?*

█ Plaintiffs argue that the statute restricts speech impermissibly on the basis of its content or the speaker's viewpoint, since telemarketing computers with prerecorded messages are prohibited for commercial uses, but not for political activities, polling, or solicitations from nonprofit organizations. Plaintiffs refer to *R.A.V. v. St. Paul,* — U.S. ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) for the proposition that the Supreme Court prohibits regulations of speech based upon the content or viewpoint of that speech.

Defendants contend the TCPA's restrictions are not content-based, reiterating that on its face, the statute bans all automated calls and leaves the implementation of exemptions to the FCC. As reviewed above, however, the statute does distinguish among forms of speech, and these distinctions are undeniably based upon the content of the speech.

As *Discovery Network* states, "government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech.'" *Discovery Network,* — U.S. at ——, 113 S.Ct. at 1516 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (other citation omitted)).

In *Ward,* the Supreme Court stated:

The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 295 [104 S.Ct. 3065, 3070, 82 L.Ed.2d 221] (1984). The govern-

ment's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Ward,* 491 U.S. at 791, 109 S.Ct. at 2753.

More recently, the Court rejected the argument that discriminatory treatment "is suspect under the First Amendment only when the legislature intends to suppress certain ideas." *Simon & Schuster v. Members of New York State Crime Victims Bd.,* — U.S. ——, ——, 112 S.Ct. 501, 503, 116 L.Ed.2d 476 (1991).

This court concludes that the TCPA is a content-based regulation, and cannot be justified as a legitimate time, place or manner restriction on protected speech. The statute draws distinctions between the manner in which some speech is delivered (recorded versus live), but also distinguishes between messages on the basis of content (commercial versus noncommercial). Moreover, the government's purpose behind legislating the TCPA's speech restrictions is necessarily related to the *content* of the prerecorded messages; the statute restricts some speakers because the content of their messages (prerecorded commercial solicitations) is believed to be more invasive of residential privacy than the prerecorded speech of others (noncommercial solicitors).

Plaintiffs' assertion that the TCPA discriminates on the basis of viewpoint, however, is rejected. The *R.A.V.* decision establishes that while some categories of speech (including commercial speech) can be regulated more freely because of their content, the government cannot discriminate in favor or against a certain view. There must be "no realistic possibility that official suppression of ideas is afoot." *R.A.V.,* — U.S. at ——, 112 S.Ct. at 2547.

Here, there is no possibility of such suppression. Congress has not discriminated because it favors the viewpoints or messages of "live" telemarketing. The distinction between prerecorded and "live" messages, despite being unavoidably content-based, still

targets the *manner* in which the message is delivered, not its content.

As in *Discovery Network*, therefore, the validity of the TCPA must be determined under the law established in *Board of Trustees v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) and *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

■ These cases hold that restrictions on commercial speech must (1) implement a substantial governmental interest; (2) directly advance that interest; and (3) be narrowly tailored to achieve the desired objective. *Central Hudson* held a restriction on commercial speech passes constitutional muster if it directly advances a substantial governmental interest in a manner that is no more extensive than necessary to serve that interest. *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350.

C. *Is the TCPA Unconstitutional Under the Applicable Tests?*

■ The Court in *Fox* determined that a regulation restricting commercial speech can be more extensive than necessary, as long as a "reasonable fit" exists between the ends promoted by the regulation and the means chosen by the regulation for that promotion. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034. While the governmental interest addressed by the TCPA is viewed as substantial, this court finds that a reasonable fit does not exist between the interest in privacy, and the means chosen to promote that interest.

1. Is the Governmental Interest Substantial?

As noted earlier, the government's interests in promoting residential privacy, which prompted the TCPA, are substantial. A recent Minnesota decision upholding a similar state statute provides this perspective:

In short, the residential telephone is uniquely intrusive. The caller, who can convey messages which very young children can understand, is able to enter the home for expressive purposes without contending with such barriers as time or dis-

tance, doors or fences.... Moreover, the shrill and imperious ring of the telephone demands immediate attention. Unlike the unsolicited bulk mail advertisement ... the ring of the telephone mandates prompt response, interrupting a meal, a restful soak in the bathtub, even intruding on the intimacy of the bedroom.

*State of Minnesota v. Casino Marketing Group, Inc.*, 491 N.W.2d 882, 888–89 (Minn. 1992), *cert. den. Hall v. Minnesota*, —— U.S. ——, 113 S.Ct. 1648, 123 L.Ed.2d 269 (1993).

The Supreme Court addressed this privacy issue in *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), which held an ordinance banning residential picketing was not facially invalid under the first amendment. The Court described the governmental interest in the tranquility and privacy of the home—the "last citadel of the tired, the weary, and the sick"—as being "of the highest order." *Id.* at 484, 108 S.Ct. at 2502 (citations omitted). This court concludes that the TCPA addresses a substantial governmental interest in protecting residential privacy.

2. Does a "Reasonable Fit" Exist Between the Ends Promoted by the Regulation and the Means Chosen by the Regulation for that Promotion?

Under *Fox*, it is the government's burden to establish that a reasonable fit exists between the legislation it seeks to enact and the burden the law would place upon constitutional rights. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034. The Court in *Discovery Network* concluded that Cincinnati failed to calculate carefully the costs and benefits associated with the burden it attempted to place on speech.

The Court held:

In the absence of some basis for distinguishing between "newspapers" and "commercial handbills" that is relevant to an interest asserted by the city, we are unwilling to recognize Cincinnati's bare assertion that the "low value" of commercial speech is a sufficient justification for its selective and categorical ban on newsracks dispensing "commercial handbills." ...
Because the distinction Cincinnati has

drawn has absolutely no bearing on the interests it has asserted, we have no difficulty concluding . . . that the city has not established the "fit" between its goals and its chosen means that is required by our opinion in *Fox.*

*Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1516.

The same is true here. The government has failed its burden of establishing a reasonable fit between the ends sought, and the burden the legislative means places upon speech.

The TCPA creates two distinctions in regulating speech: one between recorded commercial speech and recorded noncommercial speech, and another between recorded commercial speech and both nonrecorded commercial speech and recorded commercial speech introduced by an operator. As explained below, these distinctions fail to directly advance Congress' legitimate privacy interests and are therefore impermissible.

a. *Commercial/Noncommercial distinction*

Regarding the distinction between recorded commercial messages and recorded nonprofit messages, the committee reporting on the earlier version of the telemarketing legislation interpreted evidence before it as suggesting that nonprofit solicitations are less intrusive, and less of a threat to residential privacy, than are commercial solicitations. The government relies in large measure upon this Report, and its references to supporting evidence, in arguing that the TCPA directly advances the privacy interests. This Report, however, concerned a telemarketing bill that excluded the use of automated dialers to solicit individuals who have objected to receiving such calls. Rather than imposing a ban on the use of machines delivering recorded commercial messages, the bill would have required such machines to have disconnect features, and would have required the messages to contain the name, address, and telephone number of the solicitor. H.R. 1304, § 3(b)(2) and 3(d)(2), *reprinted in* House Report at 3.

The legislation being challenged here was added later by the Senate, and is different. The TCPA bans prerecorded commercial calls altogether, rather than limiting their audience. Moreover, the Report's references to the evidence presented to the Committee suggest nothing more than telemarketing legislation was needed because of the overall increasing volume of unsolicited calls. House Report at 7.

In discussing first amendment rights involving the broadcast media, the Supreme Court has stated:

> [I]n evaluating First Amendment claims . . . we must afford great weight to the decisions of Congress and the experience of the Commission.
>
> \* \* \* \* \* \*
>
> That is not to say we "defer" to the judgment of Congress and the Commission on a constitutional question, or that we would hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity to the interests in free expression.

*Columbia Broadcasting System, Inc. v. Democratic Nat. Committee,* 412 U.S. 94, 102–03, 93 S.Ct. 2080, 2086–87, 36 L.Ed.2d 772 (1973) (quotation omitted). Courts are free, of course, to make an independent factual judgment and judicial inquiries are not bound by congressional findings. *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 2837, 106 L.Ed.2d 93 (1989). Much of the congressional judgment to which counsel for the government in this case seeks judicial deference regards legislation that is significantly different than the statute before this court. Furthermore, it is the FCC's interpretation of that congressional record—an interpretation permitted by the TCPA—which prompts plaintiffs' specific challenge. The circumstances in this case underscore the wisdom in the Supreme Court's recognition that "reliance on legislative history is hazardous at best." *Board of Educ. of Westside Community Schools v. Mergens,* 496 U.S. 226, 242, 110 S.Ct. 2356, 2367, 110 L.Ed.2d 191 (1990). Finally, the congressional references to supporting evidence are inconclusive on the question of whether the TCPA directly advances the interests in protecting residential privacy.

The government asserts that because a congressional report regarding similar legislation concluded that noncommercial calls are less prevalent, and "more expected," such calls are less intrusive, Congress has "justified" its differential treatment of these messages. This court disagrees.

As noted above, *Discovery Network* rejected a restriction on commercial speech based on a premise that such a restriction was justified by commercial speech's presumed low value. The Court, however, did leave open "the question whether, given certain facts and under certain circumstances, a community might be able to justify differential treatment of commercial and noncommercial" avenues of speech. *Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1516.

There is no such justification presented, however, in the bald assertion that banning commercial solicitations but not nonprofit solicitations furthers the protection of residential tranquility. Both kinds of telemarketing calls trigger the same ring of the telephone; both kinds of calls invade the home equally, and both risk interrupting the recipient's privacy equally. Under the TCPA, noncommercial entities may use machines to deliver prerecorded messages, which further moots the attempted distinction: both kinds of calls deprive the recipient of human interplay, both risk delivering a message to an inappropriate party, and both risk fouling the means by which telephone subscribers can record callers' messages.

This court concludes that there is no reasonable fit between the goals and the means chosen to reach those goals in the distinction Congress drew between commercial and noncommercial messages under the TCPA, and that 47 U.S.C. § 227(b)(2)(B)(i), which permits the FCC to exempt from the restrictions of TCPA those calls not made for commercial purposes, is an impermissible means of responding to Congress' legitimate interests in protecting residential privacy.

b. *Recorded/Live Commercial distinction*

The challenged statute also distinguishes recorded commercial speech from nonrecorded commercial speech or recorded commercial speech introduced by an operator. Under 47 U.S.C. § 227(b)(1)(B), it would be unlawful to initiate a telephone call using "an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." In discussing the constitutional concerns with banning automated messages, the Senate Report from the Commerce, Science, and Transportation Committee offered the following distinction:

In addition, it is clear that automated telephone calls that deliver an artificial or prerecorded voice message are more of an nuisance and a greater invasion of privacy than calls placed by "live" persons. These automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party, fill an answering machine tape or a voice recording service, and do not disconnect the line even after the customer hangs up the telephone.

S.Rep. No. 102–178, 102d Cong., 2d Sess. (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972 (footnotes omitted).

Despite the presumed frustration of some recipients, who arguably would prefer "interacting" with an operator when responding to an invasive telemarketing call, there is little to suggest that a ban on automated calls delivering prerecorded messages directly advances the interest in residential privacy.

The House Report regarding similar telemarketing legislation also fails to provide justification for distinguishing between prerecorded commercial messages and commercial messages introduced by an operator. The Report states that every day 300,000 solicitors call 18 million Americans, not including calls made by stockbrokers. House Report at 7. The Report cites a Roper Organization survey that concluded 67 percent of the respondents found calls "from people selling things" were "very annoying," while 70 percent of the respondents objected to calls "from a computer trying to sell something." House Report at 9.

Imposing a total ban on one form of commercial speech in reliance upon a statistical distinction of three percent fails the reasonable fit test. Evidence presented to this court indicates that the solicitations being banned by the TCPA make up less than

three percent of the telemarketing calls received by Americans. Second Kolker Affidavit, 18 February 1993, Para. 4. Under any interpretation of the available evidence, the TCPA's promotion of residential privacy would be by way of eliminating a very small percentage of the millions of telemarketing calls being made every day. By enacting the TCPA, the intent of Congress was to enhance residential privacy through the restriction of telemarketing calls. The Supreme Court recognized in *Discovery Network* that "all newsracks, regardless of whether they contain commercial or noncommercial publications, are equally at fault" in contributing to the proliferation of newsracks in Cincinnati. *Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1515. Similarly, all telemarketing calls, regardless of whether they are introduced by operators, or on behalf of a charity, or deliver a prerecorded message, threaten the privacy Congress is striving to protect.

The Supreme Court recognized the disparity in not burdening newspaper racks which "are arguably the greater culprit because of their superior number." *Id.* This court recognizes the same disparity where the "greater culprit" in invasive telemarketing calls— the predictive dialing machines that place far more calls than the machines delivering recorded messages—is unrestricted.

Nor does there appear sufficient consideration of "numerous and obvious less-burdensome alternatives to the restriction on commercial speech," deemed "certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *Discovery Network*, —— U.S. at ——, 113 S.Ct. at 1510, n. 13. The Court reasoned that Cincinnati failed to carefully calculate the costs and benefits associated with the burden it was placing on commercial speech. The logical discordance created from totally banning an avenue of commercial speech to achieve the minute benefit of eliminating only 62 out of perhaps 2,000 newsracks contributed to the conclusion that there was no reasonable fit between the governmental goal and the means chosen to pursue it. *Id.* at ——, 113 S.Ct. at 1510.

There is nearly identical discord here. Congress is attempting to ban totally a form of commercial speech, for the sake of reducing only slightly the number of telephone solicitations. While regulations on commercial speech are not subjected to a "least-restrictive-means" test, neither are they reviewed under a mere rational basis standard; a court may conclude there is an absence of a reasonable fit even if a regulation need not be the least burdensome possible. *Id.* at ——, 113 S.Ct. at 1510, n. 13. The rulings in *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), and *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), which address the issues of underinclusiveness, do not compel a different conclusion.

Because of the slight benefit realized, and the lack of consideration of less burdensome alternatives, and the unjustified distinctions between other forms of telephonic solicitation, this court concludes that Congress has not met its burden of showing a reasonable fit between the selective, categorical ban on one form of commercial solicitation and the goal of enhancing residential privacy.

## CONCLUSION

The government has not met its burden of establishing a reasonable fit between the legislation it seeks to enact and the burden the law would place upon constitutional rights, *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034, and has failed to consider less burdensome alternatives. The TCPA places an unconstitutional restriction upon protected commercial speech, and plaintiffs' motion for summary judgment is granted.