286 N.J. Super. 247 (1995)
668 A.2d 1099
CONSTANCE SZEFCZEK, PRO SE, PLAINTIFF,
v.
HILLSBOROUGH BEACON, DEFENDANT.
Superior Court of New Jersey, Law Division Special Civil Part Small Claims Division Somerset County.
Decided January 23, 1995.
*251 Constance Szefczek, plaintiff pro se.
Alexander F. McGimpsey, Jr. for defendant (McGimpsey & Cafferty, attorneys).
John L. Jacobus, Assistant United States Attorney for the Federal Communications Commission, Intervenor.
DUPUIS, J.S.C.
This case came before the court for trial on January 23, 1995.
The court finds the following facts:
After receiving several live telemarketing calls from the defendant, plaintiff telephoned its parent company, The Princeton Packet, on May 19, 1993 to request that the calls cease. She spoke with Mr. Martin Hilson, General Sales Manager. Plaintiff explained to Mr. Hilson at that time that her husband was terminally ill, requiring constant care, and that she did not wish to be disturbed by telemarketing phone calls. Mr. Hilson took her *252 name, address, and telephone number and assured her that he would personally see that the calls to her home were discontinued.
On August 5, 1993, plaintiff was again telephoned by the defendant. She phoned Mr. Hilson, who was not in his office, and left a message with his secretary that the calls had not stopped. She again requested that he put an end to them. Mr. Hilson did not return her call.
On November 9, 1993, plaintiff received another call from defendant, whereupon she again telephoned Mr. Hilson. Once again he was not in his office. She left another message with his secretary, but again her call was not returned.
Three months later, on February 15, 1994, defendant called plaintiff again. With the operator's permission, she tape recorded the call. Plaintiff explained her problem to the operator, who promised to remove her name from his list. He told her, however, that her name was probably still in the company's computer.
After the February, 1994 call, plaintiff was finally able to reach Mr. Hilson again. She reminded him of the reasons why she had requested that defendant stop telemarketing her home, and she told him that her previous efforts to stop the calls had been unsuccessful. She also said that she was considering a lawsuit. Mr. Hilson asked her for another chance and again said that he would handle the problem personally.
Approximately three weeks later, on March 7, 1994, plaintiff received another telemarketing call from defendant. Plaintiff again tape recorded the conversation. Plaintiff explained the situation once more to the operator, who said that she would take plaintiff's number off her list and make a notation of "Customer Irate." The operator also told plaintiff, however, that her name was probably still in the computer.
The next day, on March 8, 1994, the very same operator called plaintiff again. Plaintiff tape recorded the call, said she was not interested in the product, and hung up.

*253 PROCEDURAL HISTORY
Plaintiff brought suit in the Small Claims Division based upon the Telephone Consumer Protection Act of 1991, Public Law 102-243, December 20, 1991, which amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 to § 228 by adding a new section, 47 U.S.C. § 227 (TCPA or the statute).
The court originally heard the case on July 29, 1994. The court found that the statute was inapplicable to the facts of this case, and dismissed plaintiff's claim. Since the statute did not apply on its face, the court found it unnecessary to address the argument raised by defendant that the statute was unconstitutional.
On August 5, 1994, plaintiff filed a motion for reconsideration. Upon reconsideration, the court determined that plaintiff did in fact state a cause of action based upon the FCC regulations enacted under section (c)(2) of the statute, for the protection of residential telephone subscribers' rights. The court entered judgment in favor of plaintiff in the amount of $1,500, and enjoined the defendant from further soliciting plaintiff.
On September 26, 1994, defendant filed a motion for a new trial, which the court granted on October 14, 1994. Trial was set for January 23, 1995.
On the day of trial, the court entertained argument on the United States' motion to intervene as a plaintiff in this matter for the purpose of defending the constitutionality of the TCPA, previously challenged by defendant. The court granted the United States' motion, finding that intervention was proper under New Jersey Court Rule 4:33-1, Intervention as of Right, and alternatively under Rule 4:33-2, Permissive Intervention.

CONSTITUTIONALITY OF THE TELEPHONE CONSUMER PROTECTION ACT
The court will first address defendant's argument that the TCPA is an unconstitutional restriction on commercial speech, in violation of the First Amendment as applied to the states through the 14th Amendment. Defendant bases its argument on the *254 Oregon district court decision in Moser v. FCC, 826 F. Supp. 360 (D.Or. 1993). This court notes that Moser is the only federal court to have considered the constitutionality of the statute thus far. Moser held that the TCPA, by prohibiting the use of artificial or prerecorded voice to deliver commercial messages to residential telephones without the consent of the party being called, placed an unconstitutional restriction upon protected commercial speech.
First, this court notes that the appellate court reversed the Moser decision on February 6, 1995. Moser v. FCC, (9th Cir.1995) 46 F.3d 970.
Secondly, those decisions are in no way binding on this court.
Since the Moser decision was reversed only days ago, and since another appeal will likely follow, this court will address the defendant's arguments regarding that decision.
The precise section being challenged in Moser was subsection (b), entitled "Restrictions on the use of automated telephone equipment." Section (b)(1) is entitled "Prohibitions;" section (b)(2) provides for "Regulations; exemptions and other provisions." Section (b)(1) provides:
It shall be unlawful for any person within the United States 
(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B).
Section (b)(2) provides:
The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission 
(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe 
(i) calls that are not made for a commercial purpose.
The district court in Moser found that the TCPA was an impermissibly content-based regulation, that is, it drew a distinction between messages on the basis of their content (commercial v. noncommercial). The Act prohibits commercial messages, subject to certain exceptions, but allows the Commission to completely *255 exempt from the regulations calls made for noncommercial purposes. Furthermore, the court found that the TCPA could not be categorized as a legitimate time, place or manner restriction, as it also drew an impermissible distinction between the manner in which speech is delivered (recorded v. live).
Defendant argues that the Moser decision applies not only to subsection (b), but to the entire Act. As a result, it claims the whole statute should fall.
The facts of this case differ from Moser in that here the telemarketing calls which were made to plaintiff were accomplished through the use of live operators. As such, the language of subsection (b) of the TCPA, addressing only automated telephone equipment, is not implicated. This court finds that plaintiff's cause of action arises under subsection (c), and subsection (b) is therefore irrelevant. As such, the reasoning of Moser does not apply.
With regard to the defendant's argument that a finding of unconstitutionality with respect to one part of the statute renders the entire statute invalid, this court notes that only one year after the Moser decision, in Destination Ventures, Ltd. v. FCC, 844 F. Supp. 632 (D.Or. 1994), the same court upheld part (b)(1)(C) of the statute, prohibiting the use of any telephone fax machine, computer or other device to send unsolicited advertisements to another fax machine.
It is significant, in light of defendant's argument that the district court's Moser decision applies to the entire TCPA, that the very same court only one year later upheld part (1)(C) of the same subsection. The Destination Ventures opinion specifically addressed Moser.
Plaintiffs attempt an analogy to [§ 227(b)(2)(B)(i)].... By using the phrase "commercial purpose" in that portion of the statute, Congress intended to exclude calls made by non-profit organizations. A constitutional challenge was brought successfully. .. . The prohibition on unsolicited faxes, however, targets any fax that advertises the "commercial availability" of a good or service. This prohibition is distinct from the attempted ban on telephone solicitations made for a "commercial purpose." Under the TCPA as drafted, a non-profit organization would not be *256 said to have a "commercial purpose" if it wanted to solicit on its own (non-profit) behalf over the telephone, but it could still could not send unsolicited faxes addressing the "commercial availability" of goods or services it hoped to sell.
[Id. at 638.]
The Destination Ventures decision alone counters defendant's argument on the applicability of the Moser decision to this case.
Lastly, as the United States argued at trial, the Communications Act of 1934, the base act which § 227 amended, contains a specific severability clause. 47 U.S.C. § 608 states:
If any provision of this chapter or the application thereof to any person or circumstance is held invalid, the remainder of the chapter and the application of such provision to other persons or circumstances shall not be affected thereby.
In Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987), Justice Blackmun, writing for a unanimous Court, stated the well-established standard for determining the severability of an unconstitutional provision: "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." Id. at 684, 107 S.Ct. at 1480 (citing Buckley v. Valeo, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (per curiam)), (quoting Champlin Refining Co. v. Corporation Comm'n of Oklahoma, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)). Accord, Regan v. Time, Inc., 468 U.S. 641, 653, 104 S.Ct., 3262, 3269, 82 L.Ed.2d 487 (1984); INS v. Chadha, 462 U.S., 919, 931-932, 103 S.Ct., 2764, 2773-2774, 77 L.Ed.2d 317 (1983); United States v. Jackson, 390 U.S. 570, 585, 88 S.Ct. 1209, 1218, 20 L.Ed.2d 138 (1968).
Every court should refrain from invalidating more of a statute than is necessary. Alaska Airlines, supra, 480 U.S. at 684, 107 S.Ct. at 1479. "[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." El Paso & Northeastern R. Co. v. Gutierrez, 215 U.S. 87, 96, 30 S.Ct. 21, 24, 54 L.Ed. 106 (1909).
*257 Justice Blackmun found the relevant inquiry to be whether the statute [minus the unconstitutional provision] will function in a manner consistent with Congress' intent. Alaska Airlines, supra, 480 U.S. at 685, 107 S.Ct. at 1480. He also noted, however, that a court need never reach that question if severability has been explicitly provided for in the statute. Id. at 686, 107 S.Ct. at 1481. The inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute to depend on the constitutionally offensive provision. Id. (citing INS, 462 U.S. at 932, 103 S.Ct. at 2774; Champlin, 286 U.S. at 235, 52 S.Ct. at 565.) Unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute. Alaska Airlines, supra, 480 U.S. at 686, 107 S.Ct. at 1481.
In this case, not only is there a lack of strong evidence, there is no evidence that Congress did not intend any portion of the TCPA declared unconstitutional to be severable from the remainder of the Act. The severability clause is evidence to the contrary, and the Moser court's own decision in Destination Ventures supports such an interpretation.
Thus, even if this court agreed with the district court's decision in Moser that subsection (b) is unconstitutional, the severability clause applies to excise that subsection from the remainder of the statute. That portion of Moser in no way applies to the case at hand.
Nevertheless, the Moser court's reasoning is relevant in analyzing the constitutionality of subsection (c) of the Act, and the regulations thereunder, in light of defendant's allegation that there is not a reasonable fit between the TCPA and its desired objective: enhancing residential privacy.
The Moser court relied substantially upon the Sixth Circuit decision in Discovery Network, Inc. v. Cincinnati, 946 F.2d 464 (6th Cir.1991), where the court held that an ordinance banning distribution of commercial handbills on public property placed a greater burden than necessary on commercial speech, in light of *258 its goal of alleviating aesthetic and safety concerns about newsracks on the streets. The Supreme Court affirmed that decision in 1993. Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). Government, the Court said, "may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified `without reference to the content of the regulated speech.'" Id. at ___, 113 S.Ct. at 1516, (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)), (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)).
The first question for the court is whether subsection (c) is impermissibly content-based; that is, does it restrict speech based solely on the content of the message?
Content-based regulations are presumptively invalid. R.A.V. v. St. Paul, 505 U.S. 377, 381, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). The First Amendment prevents government from proscribing speech because it disapproves of the ideas expressed. Id. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed to be neutral, although it may incidentally affect some speakers or messages while not affecting others. Ward, supra, 491 U.S. at 791, 109 S.Ct. at 2754.
The TCPA, at 47 U.S.C. § 227(c)(1), required that the Federal Communications Commission (FCC) initiate, within 120 days after December 20, 1991, a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The statute then provided, in (c)(2), that the FCC conclude the rulemaking proceeding not later than 9 months after December 20, 1991, and that it prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner, and *259 without the imposition of any additional charge to telephone subscribers.
Pursuant to (c)(2) of the statute, the FCC enacted the regulations found at 47 C.F.R. § 64.1200 (October 23, 1992). Section 64.1200(e) provides: [n]o person or entity shall initiate any telephone solicitation to a residential telephone subscriber:
(1) Before the hour of 8 a.m. or after 9 p.m., and
(2) Unless such person or entity has instituted procedures for maintaining a list of persons who do not wish to receive telephone solicitations made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
(i) Written policy. Persons or entities making telephone solicitations must have a written policy, available upon demand, for maintaining a do-not-call list.
(ii) Training of personnel engaged in telephone solicitation. Personnel engaged in any aspect of telephone solicitation must be informed and trained in the existence and use of the do-not-call list.
(iii) Recording, disclosure of do-not-call requests. If a person or entity making a telephone solicitation (or on whose behalf a solicitation is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the solicitation is made, the person or entity on whose behalf the solicitation is made will be liable for any failures to honor the do-not-call request.
This court finds that subsection (c) of the TCPA, along with its regulations, is indeed content-neutral. Unlike subsection (b), it does not distinguish among the messages being delivered on the basis of content, meaning commercial or noncommercial. The regulations prohibit any telephone solicitation, for commercial purposes or otherwise, unless the outlined requirements are met. All telephone solicitations not meeting the requirements are presumed to be equally invasive of the privacy of residential subscribers.
Secondly, the statute and regulations do not distinguish, as does subsection (b), based on the manner in which speech is delivered. The regulation at issue, § 64.1200(e), provides that, "no person or entity shall initiate any telephone solicitation to a residential telephone subscriber...." This language encompasses both artificial *260 prerecorded messages and messages delivered by live operators. There is no impermissible distinction.
The next question is whether subsection (c) meets the test set forth in Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980), for restrictions on commercial speech. As noted, the provisions at issue clearly affect commercial speech.
Although the First Amendment does protect commercial speech from unwarranted governmental regulation, Virginia Pharmacy Board v. Virginia Citizens Consumer Council, 425 U.S. 748, 761-762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976), commercial speech is afforded somewhat less protection under the Constitution than other forms of protected expression. Central Hudson, supra, 447 U.S. at 563, 100 S.Ct. at 2350. Because the First Amendment's concern for commercial speech is based on the informational function of advertising, the government can lawfully suppress commercial messages that mislead the public and those messages related to illegal activity. Id.
Nevertheless, the government is not without bounds. The protection available for particular commercial expression turns on the nature of both the expression itself and the governmental interest(s) served by its regulation. Id. The analysis is one of intermediate scrutiny. In order to properly restrict commercial speech, the state must assert a substantial interest. Id. at 564, 100 S.Ct. at 2350. A governmental body has an "obligation to demonstrate that it is regulation speech in order to address what is in fact a serious problem." Edenfield v. Fane, 507 U.S. 761, 776, 113 S.Ct. 1792, 1803, 123 L.Ed.2d 543 (1993).
Also, the regulation must be in proportion to that interest. Central Hudson, supra, 447 U.S. at 564, 100 S.Ct. at 2350. This burden "is not satisfied by mere speculation or conjecture; rather a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a *261 material degree." Edenfield, supra, 507 U.S. at 770-71, 113 S.Ct. at 1800.
A further requirement is that the restriction must directly advance the state interest, and it must not be excessive. If the governmental interest could be served as well by a more limited restriction on commercial speech, the restriction will not survive. Central Hudson, supra, 447 U.S. at 564, 100 S.Ct. at 2350. The Ward v. Rock Against Racism Court stated the requirement as follows: in order to be properly tailored, a regulation must focus "on the source of evils the government seeks to eliminate ... and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Ward, supra, 491 U.S. at 799 n. 7, 109 S.Ct. at 2758 n. 7.

GOVERNMENT'S SUBSTANTIAL INTEREST
In 1991, the Congress conducted hearings on several bills related to the regulation of telemarketing. The Senate reviewed S. 1462 and S. 1410, and the House reviewed H.R. 1304. See S.Rep. No. 102-178, 102d Cong., 2d Sess. (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1973, accompanying S. 1462.
In its October 8, 1991, report, the Senate Committee on Commerce, Science and Transportation stated the purpose of the bill as follows:
The purpose of the bill is to protect the privacy interests of residential telephone subscribers by requiring the Federal Communications Commission (FCC) to prescribe regulations concerning unsolicited telephone solicitations made by "live" persons to the home.
[S.Rep. 102-177, 102d Cong., 1st Sess.(1991) (accompanying S. 1410) at 1.]
The Committee cited consumer complaints as the major reason underlying the need for the legislation.
Telemarketing is generating an increasing number of consumer complaints. The FCC received over 2,300 complaints about telemarketing calls over the past year. The Federal Trade Commission, State regulatory agencies, local telephone companies, and congressional offices also have received substantial numbers of complaints.

*262 In fact, the evidence indicates that more people dislike unsolicited telephone solicitations than actually file written complaints about them. A survey conducted on behalf of one of the Bell Companies, for instance, found that only one-tenth of 1 percent of the population "likes" to receive unsolicited calls.[1]
Consumers are especially frustrated because there appears to be no way to prevent these calls.... [H]aving an unlisted number does not prevent those telemarketers that call numbers randomly or sequentially.
In general, those who complain about these calls believe that they are a nuisance and an invasion of privacy. Residential and business subscribers believe that these calls are an impediment to interstate commerce.
[Id. at 1-2. See also S.Rep. No. 102-178, 102d Cong., 2d Sess.(1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1969-1970, accompanying S. 1462.]
The Committee cited two reasons for the tremendous growth of consumer complaints: the increasing number of telemarketing firms that place telephone calls, and the advance of technology which makes telemarketing more widespread. S.Rep. 102-177, 102d Cong., 1st Sess.(1991) at 2.
The Committee found that "[m]any consumers and consumer representatives believe that legislation is necessary to protect them from unsolicited telemarketing calls." Id. at 3. According to one survey cited, approximately seventy-five percent of people contacted favored some form of regulation for telemarketing calls, and fifty percent of those favored a total prohibition of any unsolicited call. Id. See also 1991 U.S.C.C.A.N. supra, at 1970.
Another survey indicated that sixty-seven percent of respondents said calls "from people selling things" were "very annoying" and "[o]nly phone calls from a computer trying to sell something were found to annoy more people (seventy percent)." H.R.Rep. No. 102-317, 102d Cong., 1st Sess. at 9.
*263 The Committee cited the fact that forty states have already enacted legislation limiting the use of automatic dialers or otherwise restricting unsolicited telemarketing. It found, however, that state laws have had a limited effect because states do not have jurisdiction over interstate calls. I quote the report as stating "[m]any States have expressed a desire for Federal legislation to regulate interstate telemarketing calls to supplement their restrictions on intrastate calls." S.Rep. 102-177, 102d Cong., 1st Sess. at 3.
The Committee report also addressed constitutional concerns. With respect to the regulations at issue here, the report stated:
The Committee believes that the reported bill provides the FCC with sufficient direction and flexibility to design regulations that will be fully consistent with the Constitution. The legislation directs the FCC to balance individual privacy rights, public safety interests, and commercial freedoms of speech and trade.
[Id. at 6.]
The Committee found
that there is a substantial governmental interest in protecting telephone subscribers' privacy rights from unsolicited telephone solicitations. As noted previously, consumers are complaining in increasing numbers about the problem of unsolicited telephone solicitations. Protecting the privacy rights of individuals in their homes is one of the fundamental purposes of government. These complaints have grown in number despite the attempts by several State legislatures to protect consumers from intrastate calls. Federal legislation is thus necessary to protect consumers from the growing invasion of their privacy rights.
While the reported bill does not set forth specifically what restrictions the FCC shall adopt to enforce the provisions of the bill, the legislation provides the FCC with sufficient guidelines and options so that it may adopt regulations that meet the other two prongs of the Central Hudson test.
[Id. at 7.]
The Committee also noted that the House of Representatives had been considering the same factors with respect to telemarketing legislation. It noted that the House Telecommunications and Finance Subcommittee favorably reported H.R. 1304, and the House Energy and Commerce Committee favorably reported a modified version of the same bill. S. 1410 was a companion bill to *264 H.R. 1304. "The House bill directs the FCC to conduct a rulemaking to address consumer concerns about telephone solicitations. It also imposes restrictions on calls to emergency lines and unsolicited advertising by fax machine that are similar to the restrictions contained in S. 1410, as reported." Id. at 9. At the time of the report, the legislation had not been passed. Subsequently, of course, S. 1462 did become law.
Upon signing the TCPA into law, President Bush stated:
This legislation is designed for the laudable purpose of protecting the privacy rights of telephone users. However, the Act could also lead to unnecessary regulation or curtailment of legitimate business activities.... I have signed the bill because it gives the Federal Communications Commission ample authority to preserve legitimate business practices.
[1991 U.S.C.C.A.N. 1968, 1979, accompanying S. 1462.]
H.R.Rep. No. 102-317, 102d Cong., 1st Sess. (1991) at 13, demonstrates that the legislation,
reflects a balance the [House] Committee reached between barring all calls to those subscribers who objected to unsolicited calls, and a desire to not unduly interfere with ongoing business relationships. To provide as much protection as possible to the former interest while respecting the latter, the Committee adopted an exception to the general rule  that objecting subscribers should not be called  which enables businesses to continue established business relationships with customers.
[See also S.Rep. No. 102-177 at 9, 13, 19; 137 Cong.Rec. H10342 (Nov. 18, 1991).]
The United States Supreme Court recognized that the "interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Frisby v. Schultz, 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988), (quoting Carey v. Brown, 447 U.S. at 471, 100 S.Ct. at 2296). "Preserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." Carey, supra, 447 U.S., at 471, 100 S.Ct. at 2295.
This court finds that, given the above, there was a substantial government interest asserted in enacting the TCPA and regulations. Telemarketing has certainly become, in the words of the Edenfield court, a "serious problem." The potential harms are in *265 fact real, and this court finds that the TCPA will alleviate them to a material degree.

LEGISLATION DIRECTLY ADVANCING THE GOVERNMENT INTEREST
This court further finds that the substantial interest of protecting residential privacy is directly advanced by the TCPA. It is not excessive; it does not tend to restrict speech that it was not intended to restrict. The statute restricts only telephone solicitations made during certain hours and when the party soliciting has failed to comply with do-not-call procedures.

REASONABLE FIT BETWEEN THE LEGISLATION AND THE INTEREST
Lastly, the court finds that the TCPA and its regulations are sufficiently narrowly tailored to withstand constitutional scrutiny. While it is well settled that governmental restrictions on commercial speech must not be overly restrictive, the decisions in this area, "have never required that the restriction be absolutely the least severe that will achieve the desired end. Rather, [they] require only a reasonable `fit' between the government's ends and the means chosen to accomplish those ends." Board of Trustees of the State University of New York v. Fox, 492 U.S. 469, 469-470, 109 S.Ct. 3028, 3029, 106 L.Ed.2d 388 (1989). So long as the means are narrowly tailored to achieve the desired objective, it is for the governmental decisionmakers to judge what manner of regulation may be employed. Id. at 470, 109 S.Ct. at 3029.
This court finds that there is a reasonable fit demonstrated in this case. The regulations are not unduly restrictive of commercial speech other than that which was intended to be regulated.
In sum, this court finds that subsection (c) of the TCPA and the regulations thereunder constitute proper, content-neutral legislation, directly advancing a substantial governmental interest in the protection of residential privacy, demonstrating a reasonable fit between the ends sought and the means employed. It is a legitimate time, place or manner restriction on speech.
*266 It should be noted that there has been one other case in New Jersey dealing with this type of issue. In Lysaght v. State of New Jersey, 837 F. Supp. 646 (D.N.J. 1993), the district court held that Senate Bill 511, which supplemented Title 48, Chapter 17, dealing with Telephone and Telegraph Companies, was likely to violate the First Amendment. The court granted plaintiffs a preliminary injunction.
Senate Bill 511 prohibited delivery of a prerecorded commercial advertisement, unless a live operator obtained the consent of the called party. The court found that it was a content-based restriction, "explicitly distinguish[ing] between commercial and noncommercial speech.... [W]hether a particular prerecorded message is prohibited by the statute is determined by the content of the message." Id. at 648-49.
That case is easily distinguishable. The statute in question makes no such distinction. It specifically prohibits any telephone solicitation, commercial or noncommercial, live or prerecorded, if the caller fails to meet the reasonable restrictions set out in the regulations.

VIOLATION OF THE STATUTE
Having found the Act constitutional, the court will now address plaintiff's claim for relief under the Act.
The TCPA provides for plaintiff's cause of action in section (c)(5), entitled "Private right of action." The statute states therein:
A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State 
(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or
(C) both such actions.
*267 This court finds that plaintiff has properly stated a claim under this section, for defendant's violation of the FCC regulations, specifically § 64.1200(e)(2)(ii) and (iii).
Plaintiff received five telemarketing calls from defendant after she first requested that she be placed on the do-not-call list. Subsequent to that first request, she found it necessary to make three additional calls to Mr. Martin Hilson, defendant's General Sales Manager, in an effort to have the calls discontinued. Still, the calls persisted. Plaintiff also sought relief from the individual telemarketing operators with whom she spoke, asking them to please stop calling her home, but to no avail.
Defendant's conduct clearly violates (e)(2)(iii) of the regulations, which requires a person or entity making a telephone solicitation who receives a request from a residential telephone subscriber not to receive calls from that person or entity, to record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made.
Defendant violated this section by not placing plaintiff's name on its do-not-call list upon her first request, in May, 1993. The defendant attempted to show at trial that plaintiff did not make her first do-not-call request until at least August 5, 1993, when Mr. Hilson claims to have spoken with her for the first time. Mr. Hilson testified that he had no recollection of speaking to plaintiff prior to that date. Based on the evidence this court finds that plaintiff did in fact make a do-not-call request prior to that date, on May 19, 1993.
In either event, defendant still violated the statute by not putting plaintiff's name on the do-not-call list immediately, and by failing to honor her request even after it had done so. The evidence shows that plaintiff's name first appears on defendant's do-not-call list as of December 4, 1993. That is nearly 7 months after plaintiff made her initial request. Defendant's failure to place plaintiff's name on its list earlier constitutes a violation of the regulations. In addition, even after plaintiff's name did appear *268 on the list, she was telemarketed three more times. This is also a violation of the regulations.
In addition, defendant violated § 64.1200(e)(2)(ii), entitled "Training of personnel engaged in telephone solicitation." That section requires that all personnel engaged in any aspect of telephone solicitation must be informed and trained in the existence and use of the do-not-call list.
The evidence shows that on three separate occasions plaintiff spoke to two of defendant's employees about removing her name from their telemarketing list. Each time, the operators told her they would remove her name. Each time they failed to do so. Each of the operators also told plaintiff that despite whatever actions they took, her name would probably remain in the computer.
Section 64.1200(e)(2)(ii) requires that defendant properly train its employees in the use of the do-not-call list. This court finds that defendant failed to do so.
Because defendant's actions violated the regulations prescribed under subsection (c)(5) of the TCPA, plaintiff is entitled to an injunction and/or damages. This court finds that plaintiff has proven her case by a preponderance of the evidence.
Accordingly, defendant is enjoined from making any further telemarketing solicitations to plaintiff. On the issue of damages, subsection (c)(5) also provides:
It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.
The evidence has established that defendant did in fact establish and implement procedures to prevent violations of the regulations which were, for the most part, effective. Therefore, defendant has *269 an affirmative defense under the above language. Clearly defendant's procedures were not effective in this case, however.
This court will award damages to plaintiff in the amount of $2,000, $500 for each violation occurring after August 5, 1993.
With regard to treble damages, plaintiff does not allege defendant's violations were willful. She does, however, contend that they were knowing, in the sense that defendant knew its do-not-call procedures had failed. Defendant concedes this point. Plaintiff suggested at trial that perhaps defendant, aware that its procedures had failed and, in Mr. Hilson's words, "frustrated" that there had been an "inexplicable" failure in the do-not-call list, despite their doing "everything humanly possible" to prevent it, should have halted its telemarketing operations completely in order to discover the problem.
This court cannot adopt plaintiff's position. It is not reasonable. There can be no finding that defendant's actions were "knowing" in the sense of the language here, which contemplates that defendant affirmatively knew at the time each telemarketing call to plaintiff was made, that such call was a knowing violation of the statute. Had the statute imposed a "reckless" or "negligent" standard, or a standard of "knew or should have known", this court's opinion may have been different. Accordingly, treble damages will not be awarded.
NOTES
[1] Field Research Corp., The California Public's Experience with and Attitude Toward Unsolicited Telephone Calls, at 9 (March 1978) (survey conducted for Pacific Telephone Co., on file in Cal.Pub.Util.Comm'n File No. 01112); cited in Susan Burnett Luten, Give Me a Home Where No Salesmen Phone: Telephone Solicitation and the First Amendment, 7 Hastings, Const. L.Q. 129, 164. See also Mark S. Nadel, Rings of Privacy: Unsolicited Telephone Calls and the Right of Privacy, 4 Yale J. on Reg. 99, 128.