772 A.2d 868

**Michael C. WORSHAM**

v.

**NATIONWIDE INSURANCE COMPANY.**

**No. 0454, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 3, 2001.

Michael C. Worsham, Forest Hill, for appellant.

Patricia McHugh Lambert and Sheri Green (Hodes, Ulman, Passin & Jatz, P.A., on the brief) Towson, for appellee.

MURPHY, C.J., ADKINS, ROBERT L. KARWACKI, (Retired, Specially Assigned) JJ.

ADKINS, Judge.

This is a tale of two telephone calls. Michael C. Worsham, appellant, asks us to reverse the trial court's grant of summary judgment on his claims that Nationwide Insurance Company, appellee, violated the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. We conclude that summary judgment was warranted on the counts relating to the first call, but was prematurely granted on the counts relating to the second call.

## FACTS AND LEGAL PROCEEDINGS

Because we must view the evidence, and the inferences from it, in the light most favorable to the party opposing summary

judgment, we look first to the affidavit that Worsham relied on to oppose the motion. *See Heat & Power Corp. v. Air Prods. & Chemicals, Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990). Worsham does not have a Nationwide insurance policy and has never inquired about Nationwide services or products. On April 22, 1999, he received a telephone call "from a woman identifying herself by her first name only, possibly as Lisa, and who said she was calling for Nationwide" ("the First Call"). She asked him three questions—who his current insurance company was, when that insurance was due for renewal, and whether he would like to save up to 15 percent on his insurance. Worsham told her he was not interested, and requested that she "place [his] telephone number on the do-not-call list."She replied, "okay," and hung up without stating her full name, or providing "a telephone number or address of Nationwide Insurance." Worsham could tell from his caller identification box, however, that the call came from a telephone number assigned to Rick Gerety & Associates ("Gerety"). The caller "did not make any mention that she was calling on behalf of [Gerety] or anyone else other than Nationwide."

On May 18, 1999, Worsham received a second telephone call soliciting him in a similar manner (the "Second Call"). The caller identified herself as "Charlotte," and "said she was calling for Nationwide." She asked him substantially the same three questions that he had been asked in the First Call. Worsham said he was not interested, and asked that his number be placed on the do-not-call list. He also requested a copy of the telemarketer's "do-not-call" policy. The woman agreed to both requests, but hung up without giving her full name, telephone number, or address. She "never mentioned that she was calling on behalf of anyone else other than Nationwide." Worsham's caller identification box did not provide any telephone number or identifying information regarding the source of the call. He never received a copy of the do-not-call policy.

On September 10, 1999, Worsham filed a complaint in the Circuit Court for Harford County, alleging that both phone

calls were made by Nationwide in "knowing and willful" violation of the TCPA. He sought $500 in compensatory damages, plus treble damages, for each separate violation of the TCPA, which he itemized in separate counts.

First Call Violations:

1. Failure to train personnel;

2. Failure to record a do-not-call request;

3. Failure to provide proper identification;

4. Failure to maintain a record of a do-not-call request;

Second Call Violations:

5. Failure to train personnel;

6. Failure to provide proper identification;

7. Failure to provide a do-not-call policy on demand.

Nationwide moved to dismiss the complaint, and later amended its motion to include an alternative motion for summary judgment. Nationwide supported its motion with an "Agency Agreement" and the affidavit of Rick Gerety, president of Rick Gerety & Associates. Gerety's company is a Nationwide insurance agency doing business in Harford County. Mr. Gerety stated that "Kelly," one of the company's telephone solicitors, placed the First Call to Worsham. Kelly and Gerety complied with Worsham's request to put his name and phone number on its do-not-call list. Gerety did not make the Second Call and had no employee named Charlotte.

After a hearing, the trial court issued a written memorandum and order granting summary judgment on all counts. Relying on the handful of reported decisions interpreting the TCPA, the court held that the TCPA did not provide Worsham any remedy as a result of the first telephone call from Gerety.

[T]he purpose of the TCPA is to prevent telephone solicitations to a person who requested the telemarketer not to call. A person's private right of action accrues only if he received a call more than once in a twelve-month period after he informed the telemarketer that he did not want to be called.

Therefore, the second call is the violation of the TCPA and triggers a person's private right of action. The second call, however, does not create compensability for the first phone call.

The court granted summary judgment on Counts 1 through 4 of the complaint because they related solely to the April 22, 1999 call.

In addition, the court held that Worsham had no claim against Nationwide based on the Second Call. It concluded that Nationwide could not be held liable under the TCPA because it had an independent contractor relationship with the first caller, Gerety.

[Nationwide] submitted an Agent's Agreement, the intent of which is to define the business relationship between Nationwide ... and Nationwide Insurance Agents.... [T]he Agreement ... provides that "[a]s an independent contractor, [the agent has] the right to exercise independent judgment as to time, place, and manner of soliciting insurance ... and otherwise carrying out provisions of the Agreement." After a review of the Agent's Agreement, it is clear to this [c]ourt that [Nationwide] does not retain control or the right to control over its agents in the performance of the agent's service.... Because [Gerety] is an independent contractor of [Nationwide,] the Plaintiff has no cause of action against [Nationwide] for the second telephone call.

In addition, the court found that Nationwide could not be liable for the Second Call because no reasonable consumer would expect that a do-not-call request to one Nationwide insurance agent would "cover" all other insurance agents operating as independent contractors of Nationwide.

[A] reasonable consumer would not expect Nationwide ... to be included in [Worsham's] do-not-call request [to Gerety]. Rick Gerety & Associates is one of eighteen Nationwide insurance agents in Harford County. It is entirely reasonable for the Plaintiff to expect that he would no longer receive telephone solicitations from [Gerety] for the prescribed twelve-month period. It is wholly unreasonable,

however, for the Plaintiff to expect that his do-not-call request applied to Nationwide Insurance Company as a whole.... [A] reasonable consumer would not expect the Plaintiff's do-not-call request, documented by [Gerety], to apply to every individual Nationwide insurance agent.

The court granted summary judgment on Counts 5, 6, and 7 relating to the May 18, 1999 call. Worsham filed this timely appeal.

## DISCUSSION

Worsham complains that the court erred when it concluded that Nationwide could not be held responsible for either of the two telephone calls. He argues that the court predicated its decision on an erroneous construction of the TCPA, on an erroneous finding that the first caller was an independent contractor, and on an erroneous assumption that Nationwide could not be held liable for TCPA violations committed by an independent contractor. In addition, he contends that given the nature of the relationship between Nationwide and individual Nationwide insurance agencies, Nationwide is responsible for the calls as a matter of law. We disagree with Worsham's attempt to expand the TCPA, but agree that the evidence before the court at the time of the motion created a dispute regarding whether the calls were made "on behalf of" Nationwide.

## I.

## The Telephone Consumer Protection Act

In 1991, Congress enacted the Telephone Consumer Protection Act, Pub.L. No. 102–243 (1991) (codified at 47 U.S.C. § 227), "to protect the privacy rights of citizens by restricting the use of the telephone network for unsolicited advertising." *In the Matter of Consumer.Net v. AT & T Corp.*, 15 F.C.C.R. 281, 282, 1999 WL 1256282 (1999). In doing so, it created a private right of action for unwanted telephone solicitations.

*A person who has received more than one telephone call within any 12 month period by or on behalf of the same*

*entity* in violation of the regulations prescribed under [the TCPA] may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State ... an action ... to receive up to $500 in damages for each such violation.... It shall be an affirmative defense ... that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(c)(5) (emphasis added).

Congress also permitted states to impose more restrictive intrastate requirements for telephone solicitations, *id.* at § 227(e)(1)(D), and established alternative enforcement remedies by state officials. Under Section 227(f),

[w]henever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls ... in violation of [the TCPA] or the regulations prescribed under [the TCPA], the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions.

47 U.S.C. § 227(f)(1).

Pursuant to the TCPA, the Federal Communications Commission ("FCC" or "Commission") promulgated regulations designed to balance these privacy concerns "against the continued viability of the telemarketing industry." *In the Matter of Consumer.Net*, 15 F.C.C.R. at 282, 1999 WL 1256282. In its initial rulemaking proposal, the FCC "note[d] that unsolicited sales call generated $435,000,000,000 in sales in 1990—a more than four-fold increase since 1984. Thus, many consum-

ers find such contacts beneficial and actually purchase the goods and services offered. The Commission tentatively conclude[d] that it is not in the public interest to eliminate this option for consumers." *In the Matter of the Telephone Consumer Protection Act of 1991,* 7 F.C.C.R. 2736, 2740, 1992 WL 695438 (1992).

The Commission also declined to create do-not-call databases on a national or industry-wide basis. *See In the Matter of Consumer.Net,* 15 F.C.C.R. at 282–83, 1999 WL 1256282. Instead, it concluded that "company-specific do-not-call lists would be the most effective, least costly, and most easily implemented means of curbing unwanted telephone solicitations." June 11, 1996 Letter of G. Matise, Chief, Network Services Division, FCC Common Carrier Bureau, to J. Parker, Ass't Att'y Gen., Chicago Consumer Fraud Bureau (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 7 F.C.C.R. 8752, 8763–65 (1992)).

The FCC required telephone solicitors to establish "procedures for maintaining a list of persons who do not wish to receive telephone solicitations made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(e)(2). At a minimum, telephone solicitors must comply with the following requirements.

- "Written policy. Persons or entities making telephone solicitations must have a written policy, available upon demand, for maintaining a do-not-call list." *Id.* at § 64.1200(e)(2)(i).

- "Training of personnel engaged in telephone solicitation. Personnel engaged in any aspect of telephone solicitation must be informed and trained in the existence and use of the do-not-call list." *Id.* at § 64.1200(e)(2)(ii).

- "Recording, disclosure of do-not-call requests. If a person or entity making a telephone solicitation *(or on whose behalf a solicitation is made)* receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the

request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. *If such requests are recorded or maintained by a party other than the person or entity on whose behalf the solicitation is made, the person or entity on whose behalf the solicitation is made will be liable for any failures to honor the do-not-call request.* In order to protect the consumer's privacy, persons or entities must obtain a consumer's prior express consent to share or forward the consumer's request not to be called to a party *other than the person or entity on whose behalf a solicitation is made* or an affiliated entity." *Id.* at § 62.1200(e)(2)(iii) (emphasis added).

- "Identification of telephone solicitor. A person or entity making a telephone solicitation must provide the called party with the name of the individual caller, *the name of the person or entity on whose behalf the call is being made,* and a telephone number or address at which the person or entity may be contacted." *Id.* at § 62.1200(e)(2)(iv) (emphasis added).

- "**Affiliated persons or entities.** In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call *(or on whose behalf a call is made),* and will not apply to *affiliated entities* unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised." *Id.* at § 64.1200(e)(2)(v) (emphasis added).

- "Maintenance of do not call lists. A person or entity making telephone solicitations must maintain a record of a caller's request not to receive future telephone solicitations." *Id.* at § 64.1200(e)(2)(vi).

■ "In the absence of a [s]tate statute declining to exercise the jurisdiction authorized by the [TCPA], a [s]tate court has jurisdiction over TCPA claims." *Kaplan v. Democrat & Chronicle,* 266 A.D.2d 848, 698 N.Y.S.2d 799, 800 (N.Y.App.

Div.1999); *see Int'l Science & Tech. Inst. v. Inacom Communications,* 106 F.3d 1146, 1158 (4th Cir.1997). Thus far, Maryland has not refused to exercise such jurisdiction. Accordingly, our state courts are faced with the extraordinary situation of having exclusive jurisdiction over a private right of action brought under federal law. *See, e.g., Murphey v. Lanier,* 204 F.3d 911, 915 (9th Cir.2000) (joining Second, Third, Fourth, Fifth, and Eleventh Circuits in " 'the somewhat unusual conclusion that state courts have exclusive jurisdiction over a cause of action created by a federal statute, the Telephone Consumer Protection Act of 1991' ") (citations omitted).

State courts must interpret and apply the substance of this federal law with minimal guidance from federal courts. In doing so, there is a risk of interpreting the TCPA and FCC regulations in a manner that creates variations between each state. *See generally* S. Kolnicki, *The Telephone Consumer Protection Act and Its Burden On Small Business: An Evaluation of the Law and Its Ramifications on Telecommunications Advances,* 28 Cap. U.L.Rev. 223, 239 (1999). Although it appears that Congress intended to permit such variations, we appreciate the legitimate concerns that inconsistent interpretations may create for telephone subscribers and solicitors alike. Accordingly, in an effort to seek consistency, we shall give substantial weight to persuasive interpretations of the TCPA by both the FCC and our sister states.

## II.

### First Call Violations

The trial court granted summary judgment on counts 1 through 4, alleging violations of FCC regulations during the First Call, on the grounds that the TCPA does not provide a remedy for such "first call" violations. Worsham argues that this was error, contending that once the second call is made in violation of a previous do-not-call request, the solicitor then can be held liable for any and all violations that occurred

during either the First or the Second Call. In support of his position, he relies on the following language of the TCPA:

> "[A] person who has received more than one telephone call within any 12 month period by or on behalf of the same entity *in violation of the regulations* prescribed under this subsection . . . . [has the right to bring a private action] *based on a violation of the regulations prescribed under this subsection.* . . . to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation. . . ."

47 U.S.C. § 227(c)(5) (emphasis added). Worsham contends that the highlighted phrases indicate Congress intended to provide a private remedy that effectively "relates back" to any and all violations of FCC regulations that might have occurred during the first telephone solicitation, i.e., the predicate call. We disagree with Worsham's interpretation of the TCPA, and conclude that the TCPA provides a private remedy only for a repeat telephone solicitation.

Following established rules of statutory construction, we look to the language of the TCPA. *See Int'l Science,* 106 F.3d at 1151. By its explicit terms, section 227(c) addresses "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." Congress authorized the FCC to promulgate regulations designed to protect subscriber privacy. *See* § 227(c)(2). Although we agree with Worsham that the FCC's regulations apply during all telephone solicitations, including predicate calls, and that these regulations are a valid exercise of the Commission's authority to implement the TCPA, we do not agree that the TCPA creates a private right of action in state court for every violation of these regulations.

■ We find no ambiguity in section 227(c)(5). It authorizes a private right of action only for a repeat call, by limiting standing to "person[s] who [have] received more than one telephone call. . . ." 47 U.S.C. § 227(c)(5). This language makes it clear that Congress intended to limit claims in state

court to those alleging unwanted repeat telephone solicitations. If Congress had otherwise intended to provide a private remedy for any and all violations of the FCC regulations, it easily could have created a remedy for "any person who has received a telephone call ... in violation of the regulations prescribed under this section." We shall not rewrite the TCPA by ignoring the plain words in it. *See generally Int'l Science*, 106 F.3d at 1152 ("in enacting the TCPA, Congress wrote precisely"). We conclude that section 227(c)(5) does not provides a private remedy in state court for any violations of FCC regulations that may have occurred during a predicate telephone solicitation call.

This interpretation is consistent with interpretations of the TCPA by federal and state courts. In *International Science, supra*, the Fourth Circuit recognized that Congress intended to limit private actions under section 227 in order to avoid overburdening state courts.[1] Noting that the substantive protections afforded by the TCPA are "enforceable by state attorneys general or the Federal Communications Commission irrespective of the availability of a private action in state court," the Court emphasized that Congress was cognizant of creating a private remedy that could overwhelm state courts.

> [I]t is readily apparent from the congressional findings contained in the TCPA itself that Congress considered the effect that a newly created private right of action would have on judicial administration.... [C]oncerned over the potential impact of private actions on the administration of state courts, Congress included a provision to allow the states to prohibit private TCPA actions in their courts....

---

1. The case involved alleged violations of the "unsolicited fax" provisions in section 227(b), for which Congress created a private right of action substantially identical to that provided for telephone solicitations. *International Science* is the seminal federal case upholding the constitutionality of Congress' unusual direction that state courts have exclusive jurisdiction over the federal causes of action created by the TCPA, subject to each state's right to "opt out" of exercising such jurisdiction. *See Int'l Science*, 106 F.3d at 1156–58.

> Congress has a legitimate interest in not overburdening state ... courts....

*Int'l Science,* 106 F.3d at 1157.[2] Other federal courts have agreed that Congress did not intend to establish a universally available private right of action in state court for all violations of TCPA regulations.[3] In addition, Ohio courts have considered this issue, and rejected identical efforts to recover for violations allegedly committed during a predicate call.[4]

Our interpretation is also consistent with the FCC's position at the time it adopted its regulations implementing the TCPA. The Commission rejected complaints that under its proposed rules, "telephone subscribers must receive at least one unwanted solicitation before making a claim under the rules" implementing Section 227(c)(5). Instead, it concluded that

> no further authority is required ... to accomplish the goals of the TCPA to restrict unwanted telephone solicitations.... The record supports our conclusion that the proposed rules strike a reasonable balance between privacy rights, public safety interests, and commercial freedoms of

---

**2.** Observers have noted that the TCPA "seems to have stimulated a cottage industry of 'business' consumer advocates who make money on the stray telephone call[,] [p]erhaps ... even using the advancing technology ... such as caller ID to efficiently identify potential lawsuits and reap profits." *See Kolnicki, supra,* 28 Cap. U.L.Rev. at 243.

**3.** *See, e.g., Murphey v. Lanier,* 204 F.3d 911, 914 (9th Cir.2000) ("A litigant may find that there is no remedy in state court, but that does not deprive citizens of the right to be free from unsolicited facsimile transmissions, confer federal jurisdiction over a private action, or violate the Fourteenth Amendment").

**4.** *See, e.g., Charvat v. ATW, Inc.,* 127 Ohio App.3d 288, 712 N.E.2d 805, 807 (1998) ("We do not agree with [the] contention that once the second call is made, triggering the right to file suit, each and every violation from the first call forward is compensable. The intent of the statute is not to create liability beginning with the first call"); *Charvat v. Colorado Prime, Inc.,* No. 97APG09–1277, 1998 WL 634922, *4, 1998 Ohio App. LEXIS 4292, *9–10 (Ohio App. Sept. 17, 1998) (because "the intent of [s]ection 227(c)(5) ... is not to create liability beginning with the first call, .... a plaintiff is not entitled to damages for violations prior to the second call").

speech and trade, which Congress cited as its paramount concerns in enacting the TCPA.

7 F.C.C.R. at 8781, 1992 WL 690928.

██ Given the statutory language limiting standing, Congressional concerns about overburdening state courts, and the FCC's conclusion that a limited remedy for repeat calls satisfied the goals of the TCPA, we conclude that Congress intentionally limited private actions under section 227(c)(5) to claims seeking redress for repeat telephone solicitations. We hold that the trial court was legally correct to grant summary judgment on the counts relating to the First Call.[5]

In reaching our decision, we are not persuaded by Worsham's complaints that this interpretation of the TCPA leaves him without any remedy for violations of the FCC's regulations that occurred during the First Call, such as the alleged failures to train personnel and to provide proper identification. The answer is simply that Congress declined to create an unlimited private right of action for all grievances arising from all telephone solicitations.[6] Among those grievances for which there is no private right of action under the TCPA are grievances arising from violations of FCC regulations during a predicate call.

---

**5.** Nor are we persuaded by Worsham's argument that the TCPA creates a $500 remedy for each and every violation of an FCC regulation committed in a single telephone solicitation. We find the cases awarding the monetary remedy on a "per call" basis rather than a "per violation" basis more persuasive. *See, e.g., Charvat v. Colorado Prime,* 1998 WL 634922, *5, 1998 Ohio App. LEXIS 4292, *13 ("Based on the role the regulations serve, this court finds that ... compensation should be based on the number of telephone calls in violation of the regulations"); *Szefczek v. Hillsborough Beacon,* 286 N.J.Super. 247, 668 A.2d 1099, 1110 (1995) (awarding $500 for each repeat call, despite also finding violations of training and recording regulations).

**6.** *See, e.g., Int'l Science,* 106 F.3d at 1156 (Congress did not intend to ensure uniform availability of private right of action for TCPA violations); *Foxhall Realty Law Offices, Inc. v. Telecommunications Premium Svcs., Ltd.,* 156 F.3d 432, 438 (2d Cir.1998) ("The TCPA does not provide a 'federal protection' but a permissive authorization to bring actions in state courts").

Contrary to Worsham's contention, this construction of the TCPA does not mean that a person complaining about predicate call violations has no remedy at all. Under section 227(f), there may be remedies available through the state. Moreover, states are free to provide their own remedies for conduct that is not otherwise redressed in a private action under section 227(c)(5).[7] Moreover, the FCC itself is an appropriate forum for some grievances.[8]

## III.

### Second Call Violations

Because the TCPA provides a private cause of action only for repeated telephone solicitations made by or on behalf of the same entity, or an "affiliated entity," Worsham has a viable TCPA claim against Nationwide only if he can show that Nationwide was legally responsible for both the First and Second Calls. The trial court concluded that Nationwide was not responsible for the First Call made by Gerety because (1) Gerety was an independent contractor, and (2) no reasonable consumer would expect a do-not-call request to Gerety to cover Nationwide and all of its other independent insurance agents. Worsham complains that these were factual determinations that may not be made on summary judgment in the present posture of this case, and that Nationwide may be liable for the First Call even if Gerety was an independent contractor. We agree.

---

7. *See, e.g.,* Md.Code (1998), § 8–204 of the Public Utilities Article (restricting telephone solicitation by automated dialing system).

8. Under 47 U.S.C. sections 207 and 208, complaints about such violations by common carriers may be made directly to the FCC, which has authority to fashion remedies. *See, e.g., In the Matter of Consumer.Net,* 15 F.C.C.R. 281, 1999 WL 1256282 (ruling on formal administrative complaint alleging failure to provide do-not-call policy upon demand, failure to record do-not-call requests, failure to apply do-not-call request to affiliated entity, and failure to honor do-not-call request for ten years).

## A.

### Independent Contractor

■ Worsham first argues that there was a dispute of fact regarding the nature of Nationwide's relationship to Gerety, and Nationwide's role in both telephone calls. He points out, correctly, that whether an entity acted as an agent or an independent contractor in a particular transaction is a factual question. *See, e.g., Hooters of Augusta, Inc. v. Nicholson,* 245 Ga.App. 363, 537 S.E.2d 468, 472 (2000) ("a jury question remains regarding [the caller's] status as an independent contractor"). In this case, he argues, the court improperly resolved that factual question by relying on incompetent evidence. He challenges both the admissibility and relevancy of the "Agent's Agreement" cited by the trial court as the basis for its conclusions regarding "the business relationship between Nationwide ... and Nationwide Insurance Agents."

■ We agree that this particular "Agent's Agreement" was an insufficient evidentiary basis for the court's factual finding that Gerety was an independent contractor. Nationwide submitted this agreement to the court as an independent exhibit in support of its motion for summary judgment. It offered no authenticating information, by affidavit or otherwise, attesting that this document set forth the actual terms of the relationship between Gerety and Nationwide at the time the First Call was made. Nor was that apparent on the face of the agreement itself. To the contrary, the document is dated January 1, 1987, and relates to an unidentified Ohio agent with no apparent relationship to Gerety. Although a properly authenticated agreement might provide grounds for a finding that Gerety was an independent contractor, that is a matter for the trial court to decide after remand.

Worsham also challenges the relevance of the independent contractor finding. He argues that the trial court erred by treating the existence of an independent contractor relationship as dispositive of Nationwide's liability under the TCPA. He contends that even if Gerety was an independent contractor, Nationwide still may be held vicariously liable for viola-

tions committed by Gerety, because local Nationwide insurance agents are not only agents within the meaning of the Insurance Article, but also agents with the power to bind Nationwide under common law principles of agency. He cites an FCC decision stating that its

> rules [under the TCPA] generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations. Calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* ¶ 13, 10 F.C.C.R. 12391, 12397, 1995 WL 464817 (1995) (footnote omitted).

Nationwide counters by relying on the presence of "independent contractor" language in the agreement it allegedly uses with local insurance agents such as Gerety. It alleges that such agreements include a specific provision that local agents are solely responsible for their solicitation activities. The company argues that this language means that, as a matter of law, Gerety was not acting as Nationwide's common law agent when it made the First Call, and therefore, was not acting "on behalf of" Nationwide when it called Worsham.

■ We conclude that the existence of an independent contractor relationship between Nationwide and Gerety would not, in itself, insulate Nationwide from liability under the TCPA. The TCPA reaches not only the entity making the telephone solicitation, but also any entity "on whose behalf" such calls are made.[9] Even if Gerety was an independent contractor, that status alone would not eliminate the possibility that Gerety was calling on behalf of Nationwide. Nation-

---

9. *See* 47 U.S.C. § 227(c)(5) (providing private remedy for repeat calls "made by or on behalf of the same entity"); *cf. Hooters,* 537 S.E.2d at 472 ("even if the jury finds that [the caller] was an independent contractor, [defendant] may still be liable" for unsolicited faxes because the entity "on whose behalf" they are sent is ultimately liable for complying with TCPA regulations).

wide can be liable for calls that an independent contractor makes at Nationwide's direction and request.

Whether the First Call and the Second Call were made "on behalf of" Nationwide is a matter of fact that is disputed on the record now before us. Although the nature of the contractual relationship between Nationwide and Gerety is relevant to this factual question, it is by no means dispositive. As Worsham correctly notes, "[w]hat is more indicative is whether Nationwide controls the content of the solicitations its agents use. . . ." It is unclear what responsibility Nationwide had, if any, for the two calls to Worsham. Worsham's unrebutted affidavit stating that, within one month, both callers used substantially identical scripts stating that they were calling "for Nationwide," without mentioning any individual Nationwide insurance agency, was sufficient to raise a dispute as to whether the solicitation was made on behalf of Nationwide. In the absence of additional information about Nationwide's contractual and de facto relationship to either Gerety or these calls, Worsham's affidavit raises an inference that Nationwide may have directed or authorized Gerety and other agents in the area to conduct telephone solicitations via a common script created or approved by Nationwide. In the event such scripts failed to meet the requirements set forth in the FCC regulations, a fact finder could conclude that both calls were made in violation of the TCPA "on behalf of" Nationwide. Accordingly, we shall vacate the judgments entered on the counts relating to the Second Call (i.e., counts 5, 6 and 7).

## B.

### "Affiliated Entity"

Our decision makes it unnecessary for us to decide Worsham's alternative argument that the trial court erred in failing to hold that Nationwide can be liable even if it had no direct role in either call, because as a matter of law, it is an "affiliated entity" of Gerety and other Nationwide insurance agents. For the guidance of the trial court and the parties in

the remanded proceedings, however, we shall address the issue. *See* Md. Rule 8–131(c).

The term "affiliated entity" appears only in the FCC's regulations under the TCPA, and is not in the language of the TCPA itself. Although we found no definition of the term in the TCPA context, we note that Congress has defined "affiliate" under the Federal Communications Act of 1934, as amended. In the "definitions" section, Congress provided that

the term "affiliate" means a person that (directly or indirectly) owns or controls, is owned or controlled by, or is under common ownership or control with, another person. For purposes of this paragraph, the term "own" means to own an equity interest (or the equivalent thereof) of more than 10 percent.

47 U.S.C. § 153(a). Congress has adopted similar definitions in other communications legislation.[10] The FCC also has defined the term "affiliated entity" to mean having a substantial stake in ownership and operational control. In establishing regulations governing cost-of-service showings by cable operators, the FCC defined an "affiliated entity" as "an entity with a five percent or greater ownership interest in the cable operator...." *See Cost of Service Requirements for Cable Television Industry*, 58 Fed.Reg. 40762, 40772 (July 30, 1993) (proposed rule) (codified at 47 C.F.R. pt. 76).

We shall construe the term "affiliated entity" consistently with the meaning that Congress and the FCC has given it in these other contexts.[11] Based on those definitions, we con-

---

**10.** *See, e.g.,* 47 U.S.C. § 522 (under Cable Television Consumer Protection and Competition Act of 1992, "the term 'affiliate' ... means another person who owns or controls, is owned or controlled by, or is under common ownership or control with, such person"); *id.* at § 1108 (under Launching Our Communities' Access to Local Television Act of 2000, the term "affiliate" is defined identically, with additional proviso that it "may include any individual who is a director or senior management officer of an affiliate, a shareholder controlling more than 25 percent of the voting securities of an affiliate, or more than 25 percent of the ownership interest in an affiliate not organized in stock form").

**11.** We note that the Maryland Legislature has similarly defined an "affiliate" for purposes of insurance acquisitions and control, to mean

clude that "affiliated entities" must be related by ownership or operational control.

In this case, contrary to Worsham's contentions, there is nothing in the record to indicate that Nationwide and Gerety are affiliated entities. The mere existence of a mutual benefit resulting from such telephone solicitations is not sufficient to establish affiliation. Even if "a call by a Nationwide agent ... is made with the objective of profiting both the agent and Nationwide," as Worsham alleges, the fact that the call might benefit Nationwide does not establish ownership or operational control. Worsham has not alleged that Nationwide has any ownership stake in Gerety. In the absence of allegations that Nationwide had an ownership position or exercised operational control over Gerety, allegations regarding Nationwide's contractual rights pricing, policy acceptance, billing, and servicing, are not sufficient to establish an inference of affiliation under the TCPA.

**JUDGMENT ON COUNTS ONE THROUGH FOUR OF THE COMPLAINT AFFIRMED. JUDGMENT ON COUNTS FIVE, SIX, AND SEVEN OF THE COMPLAINT VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID EQUALLY BY APPELLANT AND APPELLEE.**

---

"a person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with another person." Md.Code (1995, 1997 Repl.Vol.), § 7–101(b) of the Insurance Article. "Control" is defined by a "direct or indirect possession of the power to direct or cause the direction of the management and policies of a person, through ownership of voting securities ..., or by contract other than a commercial contract for goods or nonmanagement services, or otherwise, whether or not the power is exercised or sought to be exercised." *Id.* at § 7–101(c).